EDWARD B. ST. JOHN, CLAIMANT OF THE STEAMBOAT NEPTUNE, APPELLANT, *v.* ZEBULON A. PAINE, SARAH NORWOOD, JOHN BUCKNAM, ANDREW BRADFORD, AND AUGUSTUS NORTON, LIBELLANTS.

The following are the rules which ought to govern vessels when approaching each other : —

1. *Of Sailing Vessels.* — A vessel that has the wind free, or sailing before or with the wind, must get out of the way of the vessel that is close-hauled, or sailing by or against it; and the vessel on the starboard tack has a right to keep her course, and the one on the larboard tack must give way, or be answerable for the consequences.

So, when two vessels are approaching each other, both having the wind free, and consequently the power of readily controlling their movements, the vessel on the larboard tack must give way, and each pass to the right. The same rule governs vessels sailing on the wind, and approaching each other, when it is doubtful which is to windward.

But if the vessel on the larboard tack is so far to windward that, if both persist in their course, the other will strike her on the lee side, abaft the beam or near the stern, in that case the vessel on the starboard tack should give way, as she can do so with greater facility and less loss of time and distance than the other.

When vessels are crossing each other in opposite directions, and there is the least doubt of their going clear, the vessel on the starboard tack should persevere in her course, while that on the larboard tack should bear up or keep away before the wind.

These rules have their exceptions in extreme cases, depending upon the special circumstances of the case, and in respect to which no general rule can be laid down

47 *

or applied. Either vessel may find herself in a position at the time when it would be impossible to conform to them, without certain peril to herself or a collision with the approaching vessel. Under such circumstances, the master must necessarily be thrown upon the resources of his own judgment and skill in extricating his own vessel, as well as the vessel approaching, from the impending peril. These cases cannot be anticipated, and therefore cannot be provided for by any fixed regulation. They can only be examined, and the management of the vessel approved or condemned, as the case may arise.

2. *Of Steam-Vessels meeting Sailing Vessels.* — Steam-vessels are regarded in the light of vessels navigating with a fair wind, and are always under obligations to do whatever a sailing vessel going free or with a fair wind would be required to do under similar circumstances. Their obligation extends still farther, because they possess a power to avoid the collision not belonging to sailing vessels, even with a free wind, the master having the steamer under his command, both by altering the helm and by stopping the engines. As a general rule, therefore, when meeting a sailing vessel, whether close-hauled or with the wind free, the latter has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her.

3. *Of Steamers meeting each other.* — It is the duty of each vessel to put the helm a-port.

4. *Of keeping Watch.* — The pilot-house of a steamer is not the proper place at which to station a watch at night. A competent and vigilant look-out stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching at the earliest moment, is indispensable to exempt the steamboat from blame, in case of accident in the night-time, while navigating waters on which it is accustomed to meet other craft.

The owner is responsible for damage resulting not only from want of care and attention on the part of the persons in charge of the vessel, but also from the want of proper knowledge and skill to enable them to manage her according to established nautical rules.

THIS was an appeal from the Circuit Court of the United States for the Southern District of New York.

The circumstances of the case will be best explained by inserting the libel and answer, which were as follows.

" To the Honorable Samuel R. Betts, Judge of the District Court of the United States for the Southern District of New York.

" The libel and complaint of Zebulon A. Paine of Eastport, in the State of Maine, owner of one half part of the schooner Iole, and owner of part of the cargo lately shipped on board thereof; Sarah Norwood of Eastport, in the State of Maine, aforesaid, owner of the other half part of the said schooner; John Bucknam, owner of part of the cargo lately shipped on board thereof; Andrew Bradford, owner of part of the cargo also lately shipped on board thereof; Joseph Sumner, master of the said schooner; James McCollar, mate thereof; Ambrose Tucker, James Woorster, seamen, and Henry Cuff, cook, all of said schooner; and Augustus Norton of Eastport, a passenger on board of the said schooner, against the steamboat Neptune, all parties intervening for their interest in the same, in a cause of civil and maritime jurisdiction.

" And thereupon the libellants allege and propound respectively upon and according to their respective best knowledge, information, and belief, as follows : —

" 1st. That the said schooner Iole, belonging and owned in Eastport, aforesaid, whereof the said Joseph Sumner was master, on or about the 7th of July, 1846, set sail and departed from the port of Eastport, in the State of Maine, aforesaid, with the said Joseph Sumner as master, having on board of said schooner a cargo consisting of laths, pickets, plaster, fish in barrels, thirty empty barrels, and two barrels of beer, and two packages of money, bound for the port of New York; and that the said schooner was then tight, stanch, and strong, and well manned, tackled, apparelled, and appointed, and was, in every respect, fit for the voyage she so undertook.

" 2d. That in the evening of the 14th day of July, aforesaid, the said schooner, with three passengers, and with the said cargo on board, had successfully proceeded in and upon her said voyage past and about one mile to the south of the lightboat stationed off the Middle Ground, a shoal nearly opposite to Stratford Point, and that the said schooner passed the lightboat, being about one mile to the southward thereof.

" That the said schooner was then steering about a west course, the wind being nearly from the north; that the night was clear, and the said vessel could be easily discerned at a considerable distance; that whilst sailing upon her course, about west, with a fresh wind, going at from six to eight knots per hour, and a short time after the said schooner had passed the said light-boat, and between the hours of nine and ten o'clock at night, on the high seas, and within the admiralty and maritime jurisdiction of this court, she was negligently run against and into, by the said steamboat Neptune, which steamboat was then and there proceeding down the Sound from the city of New York; and the said steamboat then and there run and struck against the hull of the said schooner, between the fore and main rigging, on her larboard side, with such great force and violence as to break and tear open the hull of the said schooner, and cut her nearly in two, so that she filled and sunk almost immediately; and the said vessel and her cargo, and the clothes, money, and personal effects of the crew and passengers, were totally lost; and two of the passengers, viz. a female named Murphy, and her child, were drowned.

" 3d. That the crew of said schooner and one of the passengers, viz. the libellant Augustus Norton, saved their lives by jumping from the said schooner on to the deck of the said steamboat; that they made inquiries for the captain of the

said steamboat, but could find no captain on board; that they asked those on board of said steamboat to despatch a boat with assistance, to endeavor to save the lives of the woman and child aforesaid; but that, no assistance being offered or given, two of the crew of the said schooner, with two of the passengers of the steamboat, took the small boat of the said steamboat, and went in search of the said female and child, but that their efforts were unavailing, the said schooner having sunk, and the said female and child having disappeared.

"4th. That the said steamboat was at the time aforesaid carelessly, improperly, and unskilfully navigated, and that the loss of the said schooner, with the cargo on board thereof, and the clothes, money, and effects of the crew and passengers, and the lives of the said female and child, was occasioned solely by the fault, carelessness, and unskilful management of the said steamboat. That the crew, and those having the control and management of the said steamboat, as your libellants are informed and believe, were inexperienced in the command of the said steamboat, and were incompetent, unskilful, and insufficient, or else were careless and negligent, and by their want of skill, or carelessness and negligence, occasioned the said disaster, without the fault of the said schooner and her crew. That Long Island Sound, where the disaster occurred, is very wide, and there was ample room for the said steamboat to have passed and avoided the said schooner without any difficulty whatever.

"5th. That the said schooner or vessel, called the Iole, her tackle, apparel, and furniture, at the time of the said collision, was of the value of three thousand dollars or thereabouts, and was owned and possessed as follows; that is to say, the libellant Zebulon A. Paine was the owner of one equal half part thereof, and the libellant Sarah Norwood was the owner of the other half part thereof.

"6th. That the libellant Zebulon A. Paine was at the time of the said collision the owner of two hundred thousand laths, 4900 pickets, and 1725 S pickets, thirty-five tons of plaster, and thirty-nine barrels of fish, shipped by him on board of the said schooner upon the said voyage, which were of the value of five hundred and fifty dollars, or thereabouts, and which cargo so shipped by him was totally lost by the said collision.

"7th. That the libellant John Bucknam was at the time of the said collision the owner of thirty-six barrels of pickled fish, which he had shipped at Eastport aforesaid, on board of the said schooner, and which was totally lost by the said collision, and which last-mentioned cargo was of the value of one hundred and seventeen dollars or thereabouts.

"8th. That the libellant Andrew Bradford was at the time of the said collision owner of thirty empty beer-barrels, and two barrels containing beer, which he had shipped on board of the said schooner at Eastport aforesaid, to be carried to New York, and which last-mentioned cargo was totally lost by the said collision.

"9th. That the libellants Zebulon A. Paine and Sarah Norwood have also lost, in consequence of the said collision, the freight and passage money which the said schooner would have earned upon the delivery of said cargo in New York, and have been deprived of the use and employment of the said schooner, and have been interrupted in their business and mercantile pursuits, to their great loss and damage.

"10th. That the libellant Joseph Sumner saith, that he was the owner of, and had on board of the said schooner at the time of the collision aforesaid, and totally lost, the articles, property, and effects enumerated and specified in the schedule hereto annexed, marked A, which he prays may be taken as a part thereof; which articles, property, and effects are truly valued in the said schedule.

"That the libellant James McCollar saith, that he had on board, and was the owner of, at the time of the said collision, and totally lost, the articles, property, and effects specified in schedule B, hereto annexed, and which he prays may be taken as a part of this libel, and that the value of said several articles is truly set forth therein. That the libellant Ambrose Tucker saith, that he was the owner of, and had on board of the said schooner at the time aforesaid, and totally lost, the property and effects specified, and being of the value stated, in schedule C, hereto annexed, and which he prays may be taken as a part of this libel. That the libellant James Woorster saith, that he was at the time of the said collision the owner of, and had on board the said schooner, and totally lost by the said collision, the property and effects specified and being of the value stated in the schedule hereto annexed, marked D, and which he prays may be taken as a part of this libel. That the libellant Henry Cuff saith, that he was the owner of, and had on board of the said schooner at the time of the collision aforesaid, and totally lost, the articles mentioned in the schedule hereto annexed, marked E, being of the value therein stated, and which schedule he prays may be taken as a part of this libel. That the libellants Joseph Sumner, James McCollar, Ambrose Tucker, James Woorster, and Henry Cuff, were sailing in and on board of the said schooner, on monthly wages, and that they have been thrown out of employ and put to much expense and loss.

" That the libellant Augustus Norton saith, that he was a passenger on board of said schooner, and that he was the owner of, and had on board at the time of the said collision, the property and effects specified in schedule F, hereto annexed, and which he prays may be taken as a part of this libel; and that the said property and effects are truly valued in the said schedule, and they were wholly lost to him, and that in consequence he is now destitute, having saved nothing but one shirt, and that he has suffered great inconvenience, anxiety, and delay by reason of the said loss.

" 11th. That after information of the loss of the said schooner and her cargo, as aforesaid, was received in New York, the libellants' agents in said city caused application to be made to George Law, who, as they are informed and believe, was at the time of the said collision the owner of the said steamboat, to pay the damages which the steamboat had improperly, carelessly, and negligently occasioned as aforesaid, but that he refused to comply with such request.

" 12th. That all and singular the matters aforesaid are true, and within the admiralty and maritime jurisdiction of this honorable court, and that the said vessel, her tackle, apparel, &c., is within the district, and in verification thereof, if denied, the libellants crave leave to refer to the depositions and other proofs to be by them exhibited in this cause.

" Wherefore the libellants pray, that process in due form of law, according to the course and practice of courts of admiralty, and of this honorable court in causes of admiralty and maritime jurisdiction, may issue against the said steamboat Neptune, her tackle, apparel, and furniture, and that all persons having or pretending to have any right, title, or interest therein may be cited to appear and answer upon oath all and singular the premises. And that this honorable court will be pleased to pronounce for the damages aforesaid, and to decree such other relief to the libellants as shall to law and justice appertain.

" Also to condemn the said steamboat, her tackle, apparel, and furniture, and all persons intervening for their interest therein, in costs and expenses.

                                        " JOSEPH SUMNER,
                                          E. H. OWEN."


After a stipulation had been entered into for costs by the libellants, a monition and attachment were issued, under which the marshal attached the vessel; a stipulation being entered into on behalf of the vessel in the sum of five thousand dollars, she was discharged.

In September, 1846, the following answer was filed : —

" To the Honorable Samuel R. Betts, Judge of the District
Court of the United States for the Southern District of
New York.

" And now Edward B. St. John, of the city of New York,
in the district aforesaid, intervening for his interest in the
steamboat Neptune, appears before the honorable court, and
for answer to the libel and complaint of Zebulon A. Paine of
Eastport, in the State of Maine, Sarah Norwood of same
place, and John Bucknam, Andrew Bradford, Joseph Sumner,
James McCollar, Ambrose Tucker, James Woorster, Henry
Cuff, Augustus Norton, against the steamboat Neptune, and
all parties intervening for their interest in the same, propounds
as follows : —

" 1st. That the respondent, at the time in the said libel set
forth, to wit, on the 14th day of July aforesaid, and before and
afterwards, was the lawful owner of the said steamboat Nep-
tune, a vessel of 720 tons, or thereabouts, now in the service of
the United States, and having sailed for Texas or Mexico.

" 2d. And the respondent, as to the allegations of the said
libellants, and each of them, in the first, fifth, sixth, seventh,
eighth, ninth, and tenth articles of the said libel contained, says
that he is ignorant of and not informed concerning the same
save by the said libel, and cannot therefore admit or deny the
same to be true, but leaves the same to be proved according to
the custom and practice of this court. And the said respondent
further alleges and propounds, that the matters in the second,
third, and fourth articles of the said libel are in great part
falsely alleged, and that the truth is, as this respondent is in-
formed and believes, as is hereinafter particularly propounded.

" 3d. That the said steamboat Neptune, being in good or-
der and well and sufficiently equipped and manned, sailed
from the port of New York, in the State of New York, at five
o'clock in the afternoon of the 14th day of July, 1846, bound
for Newport and Providence, in the State of Rhode Island ;
and, in prosecution of her voyage, proceeded on her passage, at
her regular rate, until about one mile from Stratford light-boat,
when, at or about eight or ten o'clock in the evening, a vessel
was seen about half a quarter of a mile ahead, which vessel
the respondent understood to have been the schooner Iole, as
is alleged in said libel.

" 4th. That, immediately on seeing the said schooner Iole,
the course of the said Steamboat Neptune was changed to
windward of the said schooner, for the purpose of giving said
schooner the course she was then running. That when the
said steamboat was about ten or twelve lengths from the said
schooner. it was observed that the latter had changed her

course, and was luffing up so as to cross the bows of the said steamboat. That, when first seen, said schooner was running west by south, from which she changed suddenly to about northwest. That, on seeing that said schooner had changed her course, the bell of the steamboat was immediately rung to stop her, and all efforts made to avoid the collision; but the said schooner came directly across the bows of the said steamboat, and, the latter having some headway, a collision could not be avoided. That the said schooner was struck about midships, and her crew at once jumped from the rigging on board the said steamboat. That the first report was, that no one was left on board the schooner; the next was, that a female and child were left on board, upon hearing which a small boat was immediately lowered from the Neptune, and sufficiently manned, and every other possible effort was made for the purpose of saving the persons on board of the said schooner; but that, before or about the time the boat could be lowered, the said schooner disappeared; but whether any person or persons were in her at the time she sunk, this respondent is not informed, save by the said libel, and cannot state. That the captain of the said steamboat, and the men with him who manned the said small boat, continued to row about the place of the disappearance of the said schooner for more than half an hour; but, finding no person or persons needing their aid, they returned to the Neptune. That, at the urgent request of the said passengers on board the said steamboat, who feared she might have become leaky by the collision, the said boat returned to New York; and, on being examined, was found to be in safe condition, only injured a little at the bows, and fully able to have continued her voyage in safety.

"5th. That Thomas J. Davis was, at the time of the occurrence aforesaid, master and captain of said steamboat, and had been on board of her for a year or more preceding; and that Nathan Child, former captain of said boat, a pilot accustomed to conduct and manage steamboats in the harbor of New York and on the route said boat was then proceeding, and John Driver, a wheelsman familiar and experienced in the management of said boat, and who had been employed on board of her the preceding seven years, were in the pilot-house, at the wheel, at the time of the said occurrence; and that all and every of said persons were skilful and sufficient in the management of said boat, and were in no way, nor were the crew employed in said boat, inexperienced, incompetent, unskilful, insufficient, careless, or negligent in the management of said steamboat, as is falsely alleged in the fourth article of the libel aforesaid; nor was the said steamboat at the said time care-

lessly, improperly, or unskilfully navigated; nor was the loss of the said schooner and cargo and other effects in the said libel named, nor the lives of the said woman and child, if any such loss took place, occasioned by the fault, carelessness, or unskilful management of the steamboat, as is also falsely alleged in the said fourth article of the said libel aforesaid.

" 6th. That the reason why the said schooner was not seen earlier than at the distance of one quarter of a mile was, that a heavy black cloud shut her out from view, and she had no lights visible on board which could enable the captain, or pilot, or the other wheelsman, or any of the crew of the said steamboat, to discover the said schooner sooner.

" 7th. That, as soon as the said schooner was seen, the course of the said steamboat was immediately changed, according to the rule customary in such cases, so as to give the schooner the course she was pursuing. That this threw the broadside of the Neptune to view from the schooner, so that the man at the wheel on board the schooner saw the head and stern lights of the steamboat more distinctly, and her course was plainly seen by him.

" 8th. That the wind was blowing fresh, and the luffing up of the schooner so as to cross the bows of the steamboat, when the position and course of the latter were so evident to those on board the schooner, could not have been expected by any person on board the steamboat, and was contrary to all proper and lawful rules of navigation.

" 9th. That the said captain, pilot, wheelsman, and crew of the said steamboat Neptune used the greatest skill and care in the management of the same on the night aforesaid, and took every possible precaution to prevent the occurrence of any accident; and that the said steamboat did not in any manner negligently run against the said schooner, as is falsely alleged in the second article of the said libel.

" 10th. That, on the occurrence of the said accident, the captain of the said steamboat, with a sufficient number of his crew, manned the small boat, and went in her, so as to afford every possible assistance to the persons or property on board the said schooner; and the allegations in the third article of the said libel, that no captain could be found on board of said steamboat, and that no assistance was offered or given to save the lives of those on board of the said schooner, are false.

" 11th. That the accident aforesaid was occasioned by the great negligence and want of care of the officers and crew of the schooner Iole, in not providing powerful lights on deck, so that the said schooner could be discerned at a distance, and in changing the course of said schooner right across the bows of

the said steamboat when the latter was in full view of the said officers and crew, and that it was not occasioned by the fault, carelessness, or unskilful management, or by any malice or evil design on the part of the said captain, pilot, or any of the crew on board the said steamboat Neptune, as is falsely alleged in the fourth article of said libel, and that the owner of the said steamboat Neptune is not therefore liable to pay the damages by the libellant sustained.

"12th. That as to the allegations in the said tenth article of said libel contained, this respondent says, that some person or persons on behalf or in the name of the libellants, or one of them, informed the said Law of the occurrence and accident, and stated who was the counsel employed therein; that said Law immediately called on said counsel of libellants, and on behalf of the owner of said steamboat offered to leave the whole matter to the decision of any two disinterested persons, who might choose a third as umpire; that said counsel of libellants promised to see his clients, and acquaint said Law with their answer to said proposition; that the only reply or answer made was the sending of an officer of this court to take possession of said boat by virtue of the said libel in this cause.

"13th. That all and singular the premises are true; in verification whereof, if denied, the respondent craves leave to refer to the deposition and other proofs by him exhibited in this cause.

"Wherefore, the respondent prays that this honorable court would please to pronounce against the libel aforesaid, and to condemn the libellants in costs, and otherwise right and justice to administer in the premises.

"E. B. St. John, *Respondent.*
"Woodruff & Goodman, *Proctors.*"

To this answer the libellants filed a general replication.

At December term, 1846, the libel was amended, by leave of the court, by striking out the names of Joseph Sumner, master, James McCollar, mate, Andrew Tucker and James Woorster, seamen, and Henry Cuff, cook, wherever the same occur as parties to the suit.

Much testimony was taken on both sides, of which it is impossible to make an abstract; but the evidence of the master of the Iole and of the pilot of the Neptune will show the representations of the respective parties.

The following is the evidence of the master of the Iole.

"Joseph Sumner, sworn. Objected to by claimant as incompetent; master of brig Olive, trading between Eastport and New York; sixteen years mariner; five or six years master of vessel; been fifteen to twenty times through Sound.

" Master of Iole, 14th July last; his watch below at eight, P. M.; went below half past eight; night was clear, starlight; could see across the Sound both sides; did not observe any heavy clouds in any part of horizon; first notice of danger was, mate came to companion-way and called out that a steamboat was coming into them; when he went below, wind was north; steered west, at rate of seven knots; ordered them to keep west; that course would have taken them to Captain's Island, or near that, off Sawpits, making allowance for half a point variation of compass; kept up so high in order to be at windward, if wind hauled westward, which had appearance of doing; when called, got to gangway as quick as could do so; first looked ahead and saw schooner was heading up the Sound by land on northern side; looked astern, and saw Stratford Point and light-boat, latter about two points on starboard quarter, that would make course of schooner about west; then asked where steamboat was; received no answer; then looked under main boom, and saw steamboat coming head on to his broadside; she was bearing about south of him, as he judged from Old Field Point light, which was about two points on starboard quarter of steamboat; steamboat appeared fifteen to thirty feet from him, but cannot judge distances accurately at night; her wheels were then going. Could at time see the land very plain on Long Island side; struck almost immediately, about midships; schooner then had about three points of sheet off, and sails were full when he came on deck; that must have been about a west course of schooner; steamer struck to leeward; was dead to leeward of schooner when he saw her; cut in twelve feet with bow, and within four feet of through the schooner; bow pressed through the galley and stove it to pieces; she remained fastened in to schooner a minute or two; witness made to bows of steamer as soon as could, called for a rope from her, received none, and got hold of bolt-rope of schooner, and got up part way on bows of steamboat, and then thought of woman passenger on board, and got down on lumber to try to save the woman; found he could get no footing, as lumber was afloat, the schooner having sunk under it; then climbed again by rope of sail to bows of steamer; as soon as he got on bows, asked for captain of steamer; two or three voices repeated there was no captain on board; same as to mate.

" Witness then went aft to find small boat; searched four or five minutes for it, and when he found it she was lowered, and two of schooner's men and two others in her; it was shoving off as he got there; went to search for passengers, Mrs. Murphy and child.

" Witness then returned to bow of steamer, and saw small boat row up to where schooner sunk ; saw no more of her till her return.

" Did not hear bell of steamboat ring to stop her. Schooner was in good order ; about eighty tons ; had cargo on board. (Proves bill of lading of part ; deposition to this fact to put in.) The sky continued clear ; saw several vessels both sides of schooner, one ahead and one to leeward ; before collision, one to leeward was bearing about southeast ; should judge could see vessels, before and after collision, two miles in all directions ; never saw vessels carry lights in Sound such a night.

" If steamer had been running her true course when he came on deck, would have cleared schooner, for she was dead to leeward ; spoke with some one on board the steamer ; don't know who ; heard no one called captain ; was told there was none on board. Witness talked with John Driver (defendant objects, and ruled out) ; had conversation with Harris after arrival at New York ; he said he had turned in at time of collision ; did not explain cause of accident.

" Witness never said or admitted to Childs or Harris that he ought to have carried lights, or that accident was owing to his not doing so.

" Brought the woman and child from Eastport ; child about three years old ; knew her in Eastport ; was a very short time getting from his berth to deck ; did not call for woman and child, because his whole mind was on saving his vessel, and did not think of them ; after got on deck, had not time to think of woman and child ; thought of his own life and to save schooner ; thinks tide was about slack and low water."

The evidence of the pilot of the steamboat was as follows : —

" *Defence.* — Captain Nathan Childs, sworn. Resides at Providence ; is forty-seven years old ; mariner thirty-five years, in all capacities, — principally on the Sound, on all kinds of craft ; been about twenty years pilot or master of steamboats.

" Was on board Neptune, 14th July, 1846, as pilot. Left New York about five, P. M. Captain Henry Harris was also pilot on board. Thomas Davis was captain of the boat, and she had her full complement of men, as he believes ; was not on board the trip before. Witness had watch fore part of the night. Weather was clear, except black cloud at east. Between nine and ten the cloud was about two hours high, or at height of sun at two hours above horizon, and closed down to horizon, and spread northeast and southeast. Neptune was

St. John *v.* Paine et al.

running east by north. Witness stood in front part of wheelhouse, midships, on the look-out. Driver had the wheel. Witness was at middle window of wheel-house, about the middle of the boat. Wheelsman was under his directions. Could then see ahead from one fourth to three eighths of a mile, so as to d rn an object; should not think could see any thing, except a light, farther off. Neptune was going at about ten miles the hour. About twenty-five minutes before ten, first ·saw schooner (Iole), north; was then about one mile and a half from light-boat, Stratford shore light bearing east by north one half north. Schooner was then directly ahead; could just discern her by side of flag-pole. Wind was about north; quite a strong breeze. Could not tell what course of schooner was; could not see her plain enough. She was trimmed close aft, or nearly so; might have had her sheets a little eased off, that brought her sails edgewise towards him, and could not tell whether she was a sloop or schooner.

" Witness ordered the wheel hove hard a-starboard immediately; and in less than half a minute ordered bell rung to stop the engine, seeing we were coming very near; and then rang to back engine, and by that time were close to schooner, and soon struck.

" The effect of heaving wheel a-starboard was to bring boat up to northward, and altered course of boat to about northeast.

" Thinks schooner was heading about northwest. She was square across bow of Neptune when they came together. Schooner had no lights; customary for sailing vessels on Sound to show lights when steamboats are near. Thinks schooner could have easily fallen off with the wind, if she saw the steamboat. If she had altered her course a very trifle, by falling off at any time within a mile, she could have easily cleared the Neptune. As soon as struck, crew of schooner got on board Neptune. Boat of Neptune was immediately lowered, and sent out to see if could find any body. It returned without finding any person; and captain took it himself, with lantern, and went out again, and was out with it about twenty-five minutes. Came back without finding any person. She was then hoisted up, and Neptune started, first northward, and directly across the Sound; from collision three quarters to one hour Neptune lay by before going on; found Neptune leaking some; and, after consultation, it was thought more pruːent to return to New York. Got back to New York at half past three to four, A. M.

" Schooner ought to have set a light or altered her course. Pretty much all vessels set a light, in dark nights, when steam-

48 *

boats are near. It is impossible to see sail-vessels any distance such nights without.

"Neptune had two large, bright lights, which could easily have been seen four or five miles off.

"If schooner had altered her course half a point within fifteen or twenty minutes of collision, would easily have avoided it.

"Schooner could very easily have gone to leeward, not so easily to windward, of Neptune.

"Witness changed his course to about northeast to windward, and considered that the prudent and safe course to take; changed it only to escape schooner.

"According to his experience in meeting sail vessels in that way, it is the proper course for steamer to go to windward of schooner.

"Thinks there were from two hundred to two hundred and fifty passengers on board the Neptune; not a great many ladies.

"Collision was caused by schooner not setting a light, and not altering her course when she saw the Neptune.

"Not aware of any thing that could have been done on Neptune that was omitted to avoid the collision, according to his judgment and experience; and every thing was afterwards done in their power to save life and property on schooner. Schooner sunk in about eight minutes after collision.

"Houghton (clerk of boat) and Davis (a passenger) were in wheel-house at the time, with witness and man at wheel. Witness first discovered schooner. Captain Davis had turned in, at back part of wheel-house, twenty or twenty-five minutes before collision. Masters usually retire after boat gets well into the Sound.

"Witness had sailed the boat before that as master, but came on board that day as pilot; was appointed by Mr. Law. No time was specified nor wages. Witness was at that time employed on board Massachusetts, and it was understood that both boats belonged to same concern. Witness was transferred to the Neptune. Both boats had been running to same places. Does not know that they had been in opposition. Does not know that Harris, second pilot, had been on this boat before. He was also transferred from Massachusetts. Thinks that was Captain Davis's first trip at that period. Captain Rollins had been master before; understood that he and his pilots had been transferred to the Oregon that day; thinks it was about first of flood when he left New York, but does not recollect about it. Did not notice that particularly. Light-boat about fifty-five miles from New York. Thinks collision was a mile or a mile and a half from light-boat.

" A drunken man fell into dock fifteen or twenty minutes before leaving New York, and was drowned.

" Did not know or hear on board that the Neptune leaked when she left New York.

" Sound eight or nine miles wide at place of collision. Thinks the Neptune was a very little nearest south side of Sound, and on usual course he has been in the habit of taking on board steamboats. Judges his position from what had observed days going through the Sound. Did not at time see the shores. Thinks discerned Connecticut shore, but not plainly. No recollection of looking at Long Island side. Connecticut shore about five miles off; could see it plainest above.

" Could see light-boat, probably three or four miles off, and Stratford light about five miles. When he first saw schooner, she bore east by north from the Neptune, directly ahead. Could not tell how she was steering, or whether going up or down the Sound. Did not look at her with his night-glass; had no time; his whole attention was directed to attempting to clear her; and took what he thought proper measure, by throwing wheel starboard. Judged she was going up or down the Sound, and that was the precaution always taken to clear them; probably one hundred to one hundred and fifty yards off when discovered how she was heading, but could not tell distance with any certainty. Put his wheel hard a-starboard, and thinks that altered his course four to four and a half points, and got his wheel so before saw how schooner was heading. As wind was, judged she must be going up or down the Sound; and besides, if running across Sound, sails would have shown differently. Steamer struck stem on, supposes starboard side of her stem, as that was more indented than the other.

" Thinks schooner would be running six or seven miles per hour. Hit her on larboard side, nearly between her two masts.

" Should judge schooner was heading about northwest when they struck. Her boom was not thrown off much. She would lie up to about northwest on that wind; and struck her nearly midships, about at right angles.

" Can't say what would have been the effect if he had not altered his course, vessels were so near to each other.

" If schooner had not altered her course, steamer would have cleared her. Saw schooner alter her course a minute or a minute and a half before striking. Presumes she was previously heading west, or within half a point of that.

" Discovered she was going up the Sound two or three minutes after he saw her; not over three or four minutes, he should think, from time he saw her till they struck. If he had thrown

his wheel larboard, should have escaped her; but that would have been contrary to usage of passing vessels.

" If the schooner had kept her course just as she was struck, the steamer would probably have cleared her, if she had not altered her own course ; and thinks would have cleared her fifteen feet.

" Thinks rang bell to stop in one minute after saw how schooner was, perhaps one hundred to one hundred and fifty yards off; rang bell to back as soon as he supposed engineer had time to stop. Knew by motion of boat that engine had stopped. Can always tell in wheel-house whether engine is in motion. Had not left wheel-house, except to take supper ; had not laid down, or sat down.

" It is usual for sailing vessels to alter their course, or set a light, when they see a steamer coming.

" Was not requested by passengers to go into Stratford Point after accident. Did not tell any of them that he knew little of the coast. Did not tell any one that he was not a regular pilot. Had nothing to say to passengers. Did not say he could not put into New Haven.

" Watch was set about eight o'clock. Did not notice black cloud after put back for New York.

" Did not consider collision a severe one. Captain reported stern leaked some. Weight of steamboat, not going very fast, would break in an old vessel, without steamer feeling the blow much.

" It is usual for sailing vessels to set lights in passing steamboats, or coming up to them ; commonly set in shrouds or rigging. Considers it duty of vessels to show lights, according to practice in Sound.

" If he had known the course of schooner, should have thrown his wheel as he did, because schooner might have hauled off on wind. Stern of steamboat injured very little ; put on a small piece to repair her.

" Vessels on wind can keep away quicker than luff.

" With the wind that night, schooner could hold about a west course; would probably fall off a little south ; so would naturally waver a little, as wind was more or less fresh."

In February, 1847, the cause was argued in the District Court, when the court adjudged that the libellants recover their damages sustained by the collision, and that it should be referred to a commissioner to ascertain and report the amount of damages sustained by the libellants.

In April, 1847, the commissioner made the following report in the case : —

St. John v: Paine et al.

## Commissioner's Report.

" In pursuance of a decretal order made in the above-entitled cause, by which, among other things, it was referred to the undersigned, one of the commissioners of this court, to ascertain and report the amount of damages sustained by the libellants by means of the collision in the pleadings mentioned:

" I, George W. Morton, the commissioner to whom the above matter was referred, do report, that I have been attended by the proctors for the libellants and claimant, and have taken and examined the testimony offered by the respective parties, and do find that the damages sustained by the libellants, exclusive of interest, amount to the sum of $ 3,547.67, which sum is made up of the following items: —

| | |
|---|---:|
| The value of the vessel at the time she was lost, . | $ 2,500.00 |
| 75 barrels of codfish, at $ 3 per barrel, . . | 225.00 |
| 200,000 laths, at $ 1.50 per 1,000, . . . | 300.00 |
| 6,625 pickets, at $ 6.25 per 1,000, . . . | 41.40 |
| 35 tons plaster, at $ 2.25 per ton, . . . . | 78.75 |
| 30 empty beer-barrels, at $ 2 each, . . . | 60.00 |
| 2 beer-barrels partly full, at $ 2 each, . . . | 4.00 |
| Value of the stores on board, . . . . | 33.00 |
| Freight on 75 barrels codfish, at 2s. per barrel, . | 18.75 |
| | $ 3,260.90 |

| | |
|---|---:|
| | $ 3,260.90 |
| Freight on 200,000 laths, at 40 cents per 1,000, | 80.00 |
| "            6,625 pickets, at $ 2 per 1000, . | 13.27 |
| "            35 tons plaster, at $ 2.50 per ton, | 52.50 |
| "            32 beer-barrels, at 25 cents, . | 8.00 |
| | $ 3,414.67 |
| Articles on board belonging to Augustus Norton, estimating the quadrant at $ 16, . . . . | 123.00 |
| Cash in his trunk, . . . . . . | 10.00 |
| | $ 3,547.67 |

$ 3,547.67
45.57
_____
$ 3,593.24

" Amounting in the whole, without interest, to $ 3,547.67. All which is respectfully submitted.

"GEORGE W. MORTON, *U. S. Commissioner.*

" *April* 30, 1847."

In May, 1847, the District Court confirmed the report of the commissioner, with interest from the 7th of February, 1847, and costs.

The claimant appealed to the Circuit Court, which, in November, 1847, affirmed the decree of the District Court.

The claimant then appealed to this court.

It was argued by *Mr. Wood,* for the appellant, and *Mr. Gillet,* for the appellees.

*Mr. Wood* contended that, from the evidence (which he examined), the following facts were shown to exist in the case.

The schooner Iole was sailing towards New York, in Long Island Sound, steering her course west; but her actual course, by reason of lee-way, &c., west by south. The wind fresh from the north. Sailing at rate of seven miles an hour.

Under these circumstances, the wind was fair for the schooner, that is, she had what is technically called "a free wind," or "had the wind free."

The steamboat Neptune, with from 200 to 300 passengers, was going "down Sound" from New York, on her proper course, east or east by north. Her speed about ten miles an hour.

The collision was about ten o'clock. The two vessels were therefore approaching each other at a combined rate of seventeen miles per hour.

The night was clear towards the west, north, and south, but dark towards the east by reason of a "bank" or cloud in that direction, which, at or about the time of collision, rendered objects invisible.

Libellants' witnesses do not contradict this.

The direction of the wind and course of the schooner were such as to present her sails edgewise to the officers of the steamboat, so as to increase the difficulty of seeing her.

The position of her sails, however, indicated to the officers of the steamboat, when they did see her, that the schooner was sailing nearly towards them, or nearly from them, and not across the Sound.

The courses of the two vessels were nearly on the same line (in opposite directions), that is, on lines which, when the schooner was first discovered by the officers of the steamboat, converged very nearly to each other; so that the schooner was at first seen directly ahead of the steamboat, or a little on her starboard bow.

The steamboat was discovered by the crew of the schooner when several miles distant.

The officers and crew of the steamboat did not and could

not see the schooner until within a distance not greater than from one quarter to three eighths of a mile.

At the instant the schooner was discovered, the course of the steamboat was changed to windward (that is, to northeast), to avoid the schooner.

Under the circumstances, this was the prudent and proper course.

The steamboat did prudently all that was possible to avoid the collision, and to save life and property after the collision.

The steamboat was properly officered and manned.

The schooner did nothing to avoid the collision; but either kept her course (notwithstanding she saw the steamboat approaching for nearly half an hour), or she designedly luffed, or was suffered to luff, so as to cross the steamboat's bows.

The schooner neither carried lights nor showed one, when she saw the steamboat approaching.

She ought at least to have showed a light, when her crew witnessed the approach of the boat for nearly half an hour.

Upon this state of facts, *Mr. Wood* arranged his argument under the following points, viz.: —

I. To enable the owners of the Iole to recover in this case, there must have been wilful misconduct on the part of the Neptune, or negligence on her part, accompanied with freedom from blame on the part of the Iole.

There is no pretence for a charge of wilful misconduct.

II. No blame or negligence can be imputed to the Neptune.

1. She was sufficiently manned with skilful and experienced seamen.

2. She was well and sufficiently lighted, and in the proper place.

The court erred in assuming that the atmosphere was thick, as well as cloudy, ahead.

3. The Neptune had a good look-out. The night not being foggy or hazy, a look-out on her deck below was unnecessary. The look-out in the pilot-house was proper and sufficient. The court erred in supposing a closed window intervened on the said 14th of July.

4. She was properly navigated as to speed.

Though she went faster at daylight, and in the early part of her voyage, at the period in question she was going at the rate of ten miles the hour; which was not too fast, taking into view the general well-known usage in this country, and the character of the evening, which enabled the Iole or any other vessel approaching her to see her at a great distance, and on their showing a light would enable her to see them. The Perth, 3 Hagg. Adm. 417.

5. The Neptune was properly navigated, as to course, which was east by north, by the compass, and continued so until she discovered the Iole.

The Iole was approaching her on a west course, by the compass.

Allowance being made for lee-way of both vessels, which amounted to about half a point, they were going the same course reversed, with a variation of about half a point.

III. The Neptune first perceived the Iole at a distance from her of one quarter to three eighths of a mile, and could not see her at a greater distance, by reason of the cloud in the east.

IV. At this time the Iole appeared to the Neptune to be approaching or receding in nearly the same line, her sails being seen edgewise, and the Neptune appeared to be in the act of crossing her line to the northward, she being seen over the starboard bow of the Neptune, which is fully established by the specific observations of the witnesses.

V. The evidence that the Neptune, at the distance of six miles from the Iole, was on a line south of that of the Iole, and so as to pass the Iole to the south of her, is too weak to overcome the clear and decisive evidence on the last point, even assuming them to be competent witnesses.

These witnesses were interested and incompetent.

To hit the Iole as she did, (the Iole keeping her course,) and to come up directly towards her, the Neptune must have changed her course to due north, or north by west, which is not only improbable, but contradicted decidedly by the evidence.

VI. Assuming it to be true, and that the Neptune changed her course to the northward, some five or six minutes prior to the collision, it was so changed as to bring her in the position stated in the fourth point; and she was in that position when the Iole was first discovered by her, as the evidence decisively shows.

VII. If the Neptune changed her course five or six minutes before the collision, so as to bring her in the position stated in the fourth point, she was not in fault in making the change, because she did not (and could not) then see the Iole.

VIII. And it was the duty of the Neptune, when she first perceived the Iole, to endeavour to pass her, and not to stop or slack her speed.

1. By stopping her course, she would have been in danger of being run into while at rest by a moving body, thereby endangering the lives of her passengers; it being the duty of passenger vessels to use every precaution of diligence, industry, and skill to save the lives of their passengers. 2 Kent's Com. 601, 602; Christie *v.* Griggs, 2 Camp. N. P. R. 79.

2. By slackening her course she would have been less able to avoid collision than by continuing, or even accelerating, her speed.

IX. The Neptune, when in the position stated in the fourth point, was correct in putting her helm a-starboard.

1. It was highly expedient that both vessels, on account of the proximity, should be active in endeavoring to avoid collision, and that neither should keep her course, and the Neptune was bound to act on that supposition. The Friends, 1 Wm. Rob. 482.

2. It was proper that the Neptune should go to the windward; the deviation in that direction on her part was easier, as she was crossing the line of the Iole in that direction, and the Iole could bear away to the leeward more readily than she could luff towards the wind. The Shannon, 1 Wm. Rob. 469, 470.

3. This movement was not only more convenient, but conformable to the general practice of the Sound, which is a wide sea, and rules are modified by practice in particular localities.

The Trinity House regulation is applicable only to narrow channels. 1 Wm. Rob. 489.

4. The general rule that a vessel should pass to the right is not imperative, but a rule of convenience, which yields to circumstances, when both should be active. Abbott on Shipping, 476; 3 Carr. & Payne, 529; The Friends, 1 Wm. Rob. 482; The Woodrop Sims, 2 Dods. 86; The Cynosure, 7 Law Rep. 222.

X. The Neptune would have avoided the Iole, if the Iole had even kept her course; more especially, if she had borne away to the leeward, when she saw the change of course of the steamboat towards the north, by her lights. And it was her duty to bear away, as she could easily perceive the change of the Neptune's course. The Cynosure, 3 Carr. & Payne, 529.

XI. The Iole, according to the preponderating weight of the evidence, neither kept her course nor bore away from the wind, but, from the agitation of her helmsman, or some other cause, she luffed into the wind, across the course then pursued by the Neptune. The blow was received by the steamboat on the starboard side of her bows.

XII. The Iole was in fault, —

1. In not keeping a look-out, and discovering the clouds in the east; and in not forthwith showing a light when she discovered the Neptune, it being her duty, and the practice of the Sound, in such circumstances, to show a light. And it was more important for her to exhibit a light to the steamboat, than for the latter to show a light to her.

2. In not bearing away when the Neptune changed her course; which change she perceived, or might have perceived, with a proper look-out.

3. In neglecting her helm, bringing her to the wind, and crossing the track of the Neptune. See eleventh point.

XIII. The Iole being in default, cannot recover, even assuming there is fault on the part of the Neptune; it not appearing there was any wilful design on the part of the Neptune to injure. Rathbun v. Payne, 19 Wend. 399; Barnes v. Cole, 21 Wend. 188; Simpson v. Hand, 6 Whart. 311; Reeves v. Constitution, Gilpin, 579; Broadwell v. Swigert, 7 B. Monroe, 39; The Celt, 3 Hagg. Adm. 322, 323; The Cynosure, 7 Law Rep. 222; Cook v. Champlain Transportation Company, 1 Denio, 99; Brown v. Maxwell, 6 Hill, 592; Hartfield v. Roper, 21 Wend. 618; Brownell v. Flagler, 5 Hill, 282; Spencer v. Utica and Schenectady Railroad Co. 5 Barbour, 337.

XIV. If the damage is the result of accident, there can be no recovery; and accident is to be presumed, till the contrary is shown.

*Mr. Gillet* contended that, according to the evidence, the following was the state of facts: —

1. The collision took place in Long Island Sound, on the 14th of July, 1846, between nine and ten o'clock, P. M., the Neptune cutting the Iole nearly in two between the fore and main rigging, and sinking her immediately, with her cargo and two passengers. The crew saved themselves by climbing upon the Neptune. This position is not disputed.

2. The Iole, at the time of the collision, had passed about one mile south of the Middle Ground light-boat, and was west of her. The Iole was steering directly west.

3. The wind was blowing fresh from the north, and the Iole was running close on the wind.

4. The Iole did not change her course or luff before the collision, but her sails were full when it took place.

5. The steamboat changed her course to the windward by putting her wheel hard a-starboard when within a quarter to three eighths of a mile from the schooner.

6. The steamer would have cleared the schooner, if the former had not changed her course.

7. There is no custom requiring a schooner in the Sound to carry lights when sailing.

8. The night was not so dark as to render lights at all necessary.

9. It is the duty of a steamboat, when a schooner is sailing on the wind, if necessary to avoid collision, to change her

course so as to avoid the latter, and it is not the duty of a schooner to change to the leeward.

10. Claimant's witnesses state, that, when they first saw the Iole, she was a quarter to three eighths of a mile off, dead ahead.

If this evidence is true, the steamer ought to have ported her helm and gone to the south.

Upon this state of facts, *Mr. Gillet* made the following points : —

1. The schooner performed her duty in every respect, and had a right to keep her course to the west. Story on Bailments, § 611 ; The Thames, 5 Rob. 345 ; The Jupiter, 3 Hagg. Adm. 320 ; Handaysyde *v.* Wilson, 3 Carr. & Payne, 528.

2. It is incumbent on the steamboat to account for her situation, and to satisfy the court that there was no mismanagement, or mistake, or blame that can be reasonably imputed to her. The Perth, 3 Hagg. Adm. 414, 417.

3. The steamboat did not perform her duty, but was in fault in not keeping a better look-out, in changing her course to the windward, and in not turning to the leeward, (that is, to the south,) and in not earlier stopping her engine and backing when she saw the danger. The Iron Duke, 9 Jurist, 439 ; Abbott on Shipping, 234 ; Story on Bailments, § 611 ; 3 Kent, Com. 230, 5th ed. ; The Cynosure, 7 Law Rep. 222 ; The Jupiter, 3 Hagg. 320 ; 2 Wend. 452 ; The Friends, 1 Wm. Rob. 481, 483 ; The Shannon, 1 Wm. Rob. 467 ; 1 Law Rep. 313, 318 ; The Gazelle, 1 Wm. Rob. 475 ; Lowrey *v.* Steamboat Portland, 1 Law Rep. 313, 318 ; The Gazelle, 1 Wm. Rob. 475 ; Conkling's Admiralty, 305 – 311.

4. The witnesses for the steamboat state, that, when they first discovered the schooner, she was dead ahead, from a quarter to three eighths of a mile off. If so, it was the steamer's duty to have ported her helm and gone to the larboard of the schooner. She was bound to take the utmost care. The Gazelle, 1 Wm. Rob. 475 ; The Perth, 3 Hagg. Adm. 414.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the Southern District of New York.

The suit was commenced in the District Court in admiralty against the steamboat Neptune by the appellees, who were the owners of the schooner Iole, for damages done by a collision on Long Island Sound, off Stratford Point, on the evening of the 14th of July, 1846.

The Iole was laden with a cargo of lumber, plaster, and fish in barrels, and was of about eighty tons burden

The Neptune had on board from 200 to 250 passengers. The schooner was struck near midships, on the larboard side, and immediately sunk, carrying with her a woman and child, who were lost.

The libel charges that the schooner was on her voyage up the Sound to New York; and that about a mile south of the light-boat stationed off the Middle Ground, a shoal at that place, and nearly opposite Stratford Point, some sixty miles from New York, she was steering about a west course, the wind being from the north, and the night clear, so that a vessel could be descried at a considerable distance; and that while sailing upon this course with a fresh wind, going at from six to eight knots an hour, and a short time after the schooner had passed the light-boat, between the hours of nine and ten o'clock at night, she was negligently run down by the Neptune, which vessel was proceeding down the Sound from New York, and struck against her hull, head on, between the fore and main rigging on the larboard side, with such force and violence as to break open her hull, and cut her nearly in two, so that she filled and sunk immediately.

The allegations of the answer are, that the Neptune had sailed from New York at five o'clock of the afternoon of that day, bound for Newport and Providence (R. I.), and had proceeded on her voyage until within about a mile from Stratford light-boat, when, at or about eight or ten o'clock in the evening, a vessel was descried about a quarter of a mile ahead, which turned out to be the Iole in question. That immediately on seeing the vessel, the course of the Neptune was changed to windward for the purpose of giving her the course she was running. That when the Neptune was about ten or twelve lengths from the schooner, it was seen that she had changed her course, and was luffing up into the wind so as to cross the bows of the steamboat. That when first seen, the Iole was running west by south, from which she changed suddenly to about northwest; that, on seeing she had changed her course, the bell of the Neptune was immediately rung to stop her, and all efforts made to avoid the collision; but that the schooner came directly across the bows of the steamboat, and, the latter having still some headway, a collision could not be avoided.

It will be seen from these allegations of the respective parties, that the issue between them, and upon which the case must turn in favor of the one or the other, is a very simple one, whether we have regard to the law or to the facts.

The statement of the Iole is, that she was proceeding on a west course up the Sound, nearly close-hauled to the wind, with her starboard tacks on board, at the rate of about seven knots

an hour; and that, while keeping on this course, the Neptune, in an improper manœuvre to cross her trail, and pass to the windward, struck her near midships on the larboard side, and sunk her.

The allegation of the Neptune does not vary substantially from this statement, except that it charges the collision to the fault of the Iole in not keeping on her course, but suddenly changing it by throwing her head into the wind, and thereby placing her athwart the track of the steamboat as she was in the act of passing to the windward.

The general question involved in the case is, which of these vessels has been in fault; and this will depend upon the evidence produced by each in the court below, together with the application of the rules of navigation to be observed by them at the time of the collision, and with a view to avoid it, having regard to their relative position and course; and, more especially, the application of these rules under the facts and circumstances, in a case where the colliding vessel is propelled by steam, and the other by sails.

Among the nautical rules applicable to the navigation of sailing vessels are the following, viz.: — A vessel that has the wind free, or sailing before or with the wind, must get out of the way of the vessel that is close-hauled, or sailing by or against it; and the vessel on the starboard tack has a right to keep her course, and the one on the larboard tack must give way, or be answerable for the consequences. So, when two vessels are approaching each other, both having the wind free, and consequently the power of readily controlling their movements, the vessel on the larboard tack must give way, and each pass to the right. The same rule governs vessels sailing on the wind and approaching each other, when it is doubtful which is to windward. But if the vessel on the larboard tack is so far to windward that, if both persist in their course, the other will strike her on the lee side abaft the beam or near the stern, in that case the vessel on the starboard tack should give way, as she can do so with greater facility and less loss of time and distance than the other. Again, when vessels are crossing each other in opposite directions, and there is the least doubt of their going clear, the vessel on the starboard tack should persevere in her course, while that on the larboard tack should bear up, or keep away before the wind. The Friends, 1 Wm. Rob. 483; The Traveller, 2 Wm. Rob. 197; The Ann and Mary, Ib. 189; The Chester, 3 Hagg. 316; The Jupiter, Ib. 320; The Celt, Ib. 327; The Woodrop Sims, 2 Dodson, 86; The Thames, 5 Rob. 345; 3 Carr. &. Payne, 528; 9 Ib. 601; 12 Moore, 148; 3 Kent, Com. 230.

These rules have their exceptions in extreme cases, depending upon the special circumstances of the case, and in respect to which no general rule can be laid down or applied. Either vessel may find herself in a position at the time when it would be impossible to conform to them without certain peril to herself, or a collision with the approaching vessel. Under such circumstances, the master must necessarily be thrown upon the resources of his own judgment and skill in extricating his own vessel, as well as the vessel approaching, from the impending peril. These cases cannot be anticipated, and therefore cannot be provided for by any fixed regulation. They can only be examined, and the management of the vessel approved or condemned, as the case may arise.

But no one can look through the reports in admiralty in England without being struck with the steadiness and rigor with which these general nautical rules have been enforced in cases of collision, under the advice of the Trinity masters of that court, or fail to be impressed with the justice and propriety of such application, and the salutary results flowing from it.

In the case of the Traveller, an exception was set up by the colliding vessel, on the ground that the other, when first descried, was about two points on her lee bow. This was denied. But the court declined to enter into a minute examination as to which of the statements was correct, observing that it had been distinctly laid down, over and over again, that when two vessels on opposite tacks are approaching each other, and there is a probability of collision, it is the duty of the vessel on the larboard to give way at once, without considering whether the other vessel be one or more points to leeward. And, in the case of the Friends, the court, where an exception was attempted to be engrafted on the Trinity rules, in submitting the case to the Trinity masters, recommended that, for the sake of the safe navigation of the Thames and the great interests which are daily and hourly there at stake, the exception, if any were to be made, should be clear, definite, and intelligible, in order that it might, at the first glance, be known to the mercantile and maritime world; that unless it were so, it was obvious that persons in all cases would endeavor to form exceptions for themselves, and instead of certainty they would have uncertainty; instead of security, danger. And in the case of the Ann and Mary, decided in 1843, the Trinity masters observed to the court, speaking of the rule that the vessel on the larboard tack must give way, and where they had applied it with great rigor, that the golden rule so long established must be strictly adhered to, which was, that the vessel

on the larboard tack is to give way and the vessel on the starboard tack to hold on; and that the new rule which had been lately made for steam-vessels, namely, each to put the helm a-port, under all doubtful circumstances, assimilated with it. The vessel on the starboard tack puts her helm a-port to keep the wind, and the vessel on the larboard tack does the same to bear away.  That the same rule applied to sailing, as well as steam vessels, and if it should be strictly adhered to, there would not be one thousandth part of the accidents which had occurred.

These rules, which are the results of the practical experience and wisdom of navigators, cannot be too strongly impressed upon the observance of those engaged in the management of vessels on our rivers, or other waters where the course of business and trade naturally confines the navigation to a particular tract or route; and it is the obvious duty of the courts to apply them strictly in all cases of collision, unless where a clear exception is established by the party seeking to excuse himself for a departure.

Our examination thus far has been confined to the nautical rules governing the navigation of sailing vessels.  We have thus confined it, because it will be found that they are generally applicable as rules regulating the navigation in cases where one of the vessels is propelled by steam.

The striking difference is, that steam-vessels are regarded in the light of vessels navigating with a fair wind, and are always under obligations to do whatever a sailing vessel going free or with a fair wind would be required to do under similar circumstances.  Their obligation extends still further, because they possess a power to avoid the collision not belonging to sailing vessels even with a free wind, the master having the steamer under his command, both by altering the helm and by stopping the engines.  They are also of vast power and speed compared with craft on our rivers and internal seas propelled by sails, exposing the latter to inevitable destruction in case of collision, and rendering it at all times difficult, and not unfrequently impossible, to get out of their way.  Greater caution and vigilance are therefore naturally to be exacted of those in charge of them, to avoid the dangers of the navigation.  This justly results from the superior power to direct and control the course and speed of the vessel, and the serious damage consequent upon a failure to avoid the dangers.  As a general rule, therefore, when meeting a sailing vessel, whether close-hauled or with the wind free, the latter has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her.  The Shannon, 2 Hagg. Adm. 173; The Perth,

3 Ib. 414 ; The Rose, 2 Wm. Rob. 1 ; Hawkins *v.* The Duchess and Orange Steamboat Co., 2 Wend. 452 ; 3 Kent, Com. 230 ; Abbott on Shipping, p. 228 (Boston ed. 1836).

By an adherence to this rule on the part of the sailing vessel, the steamer with a proper look-out will be enabled, when approaching in an opposite direction, to adopt the necessary measures to avoid the danger, as she will have a right to assume that the sailing vessel will keep her course. If the latter fails to do this, the fault will be attributable to her, and the master of the steamer will be responsible only for a fair exertion of the power of his vessel to avoid the collision under the unexpected change of the course of the other vessel, and the circumstances of the case.

Recurring now to the facts attending the collision, as disclosed in the court below, and applying the rules of navigation as above stated, and which should have been observed by the respective vessels, we shall be enabled to determine without much difficulty which of them has been in fault.

The Iole had on board her starboard tacks, and was nearly close-hauled to the wind, and, as we have seen, had a right, and indeed was bound, to keep on her course; and it was the duty of the Neptune to adopt the proper measures to avoid her. There is some discrepancy in the evidence, but the clear weight of it is, that she kept her course till the collision occurred. She was not descried by the hands on board the Neptune till the two vessels were from one fourth to three eighths of a mile apart, with a combined speed of sixteen or seventeen miles the hour. She was then, as they supposed, directly ahead. The wheel of the Neptune was immediately put hard a-starboard, with a view to pass the schooner to the windward ; and it is supposed by the hands on board that this manœuvre would have cleared her, had she not at the same time changed her course by heading more into the wind. As we have already said, this allegation is not borne out by the evidence. On the contrary, the strong probability is, according to the testimony, that the hands on board the Neptune at the time they first descried the schooner mistook her position, and, instead of being on a line with her, that the Neptune was to the leeward, and that, in changing her course and coming up to pass to the windward, they naturally supposed the schooner had changed her course also.

Besides, she was in fault in attempting to pass the Iole to the windward. Even admitting that she was not mistaken in the position of this vessel, and that she was dead ahead, it was the duty of the Neptune to bear away ; and to pass on the larboard side. As we have seen, the observance of no

one of the rules of navigation is more strongly recommended, or more steadily enforced, in the admiralty, than this one, where two vessels are approaching in opposite directions, and there is danger of a collision.

It is observable in this connection, that the pilot in charge of the Neptune seems not to have been properly instructed in his duty in the emergency after the schooner had been discovered ahead, or if he had, that he neglected it; for we find him testifying that, if he had known her course, (which he did not when he gave the order,) he should have thrown his wheel as he did, because the schooner might have hauled off on the wind. And the other pilot on board expressed the opinion, that there was no difficulty whatever in her keeping away and avoiding the Neptune, after seeing her two or three miles off. They seem to have entertained the opinion, that, according to the rules of navigation, it was the duty of the sailing vessel to give way when meeting a vessel propelled by steam; and this even when she was on the starboard tack and nearly close-hauled to the wind. Now, the owner is responsible for damage resulting not only from want of care and attention on the part of those in charge of the vessel, but also from the want of proper knowledge and skill to enable them to manage her according to established nautical rules. Error of judgment will be no defence, especially if resulting from incompetency. And erroneous opinions of duty on the part of those in the immediate management and control of the vessel naturally turn a doubt, arising from conflicting evidence upon a question whether or not a proper direction was given in the emergency, against them.

We are also satisfied, that the steamboat was in fault in not keeping at the time a proper look-out on the forward part of the deck; and that the failure to descry the schooner at a greater distance than half a mile ahead is attributable to this neglect. The pilot-house, in the night, especially if dark, and the view obscured by clouds in the distance, was not the proper place, whether the windows were up or down. The view of a look-out stationed there must necessarily have been partially obstructed. A competent and vigilant look-out stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching at the earliest moment, is indispensable to exempt the steamboat from blame in case of accident in the night-time, while navigating waters on which it is accustomed to meet other water craft.

There is nothing harsh or unreasonable in this rule; and its strict observance and enforcement will be found as beneficial to the interest of the owners as to the safety of navigation;

a remark equally true in respect to every other nautical rule, which the results of experience have shown enter so materially into the proper management of the vessel.

It has been insisted, that the schooner was in fault in not carrying a light, so as to enable the vessels approaching to see her at a greater distance. But all agree that it was a clear, starlight night, and hence there could be no difficulty, with a proper look-out, in seeing to a sufficient distance to enable the steamer to make the proper movement to avoid her. It is not usual for sailing vessels to carry lights on such a night.

It is true, some of the witnesses on the part of the Neptune speak of a black cloud in the eastern horizon, which obscured the view from vessels going in that direction. But the allegation is not maintained by the evidence to an extent that would justify us in attributing to it any material importance.

Upon the whole, we are satisfied the decree below is right, and must be affirmed.

Mr. Justice DANIEL dissented from the opinion of the court in this case, and also in that of Newton v. Stebbins. For his opinion, see the conclusion of the last-mentioned case, which follows the present.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of New York, and was argued by counsel. On consideration whereof, it is ordered and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs and damages at the rate of six per centum per annum.