### THE NEWPORT.[1]

#### HATCH and others *v.* THE NEWPORT.

*(District Court, S. D. New York. September 17, 1886.)*

COLLISION — STEAMER AND SCHOONER — IDENTITY OF COLLIDING VESSEL — CIRCUMSTANTIAL EVIDENCE—WITNESSES DISCREDITED—COSTS NOT GIVEN.

Libelants' three-masted schooner the S., which sailed on the twenty-first of February, 1884, from Newport News for New Haven, was sunk off the New Jersey coast, and all on board perished. The appearance of the wreck, discovered on the 24th, indicated collision as the cause of the loss. The steamer Newport, on the evening of the 23d, was in collision in the same neighborhood with a three-masted schooner. Libelants, claiming that the vessel struck by the Newport was the schooner S., and that she was sunk by the steamer's fault, brought this suit against the steam-ship for their loss. *Held*, on the evidence, some of the libelants' witnesses being discredited, that libelants had not established the identity of the Newport with the vessel that had sunk the S., and that the libel should be dismissed; but, considering the libelants' misfortune and probable case, without costs.

In Admiralty.

*L. E. Chittenden* and *Geo. A. Black*, for libelants.

*Goodrich, Deady & Goodrich,* and *R. D. Benedict,* for claimants.

BROWN, J. In February, 1884, the libelants' three-masted schooner John K. Shaw, while on a voyage from Newport News to New Haven, and when some four or five miles off the Jersey coast, and about opposite Deal beach, was sunk, and all on board perished. She left Newport News between 12 and 1 o'clock P. M. of Thursday the 21st. In the afternoon of the 24th the spars of a wreck were seen projecting above water off Deal beach. The pilot of the tug-boat Maggie Moran, upon going near, found the afterpart of the deck afloat, and

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

took off a bell having the name John K. Shaw upon it. Other parts of the wreck which came ashore, or were brought ashore afterwards, were identified as belonging to the John K. Shaw.

There is no certain proof how the schooner was lost. She was deeply loaded, and had 19 tons of iron on deck. The wind on the night of the 23d was high from N. W., blowing about 50 miles per hour, with a considerable lumpy sea; and the weather during the afternoon previous was snowy. But the schooner is proved to have been staunch and sound, and her captain an experienced and capable officer, well acquainted with the coast; and the appearance of the wreck, from the breaking of the planks on the sides of the deck, indicated collision as the cause of the loss.

The steamer Newport, bound from New York to Havana, when about opposite Deal beach, and at about 7 P. M. on the evening of the 23d, had a collision with a three-masted schooner. The libel charged that this schooner was the John K. Shaw, and that she was sunk by the steamer's fault, and claims $21,062 damages. The answer avers that the schooner with which the steamer collided was not the John K. Shaw, but some other schooner unknown to the claimants; and that the steamer's collision was a slight one, her starboard bow grazing the schooner's starboard quarter without injury to either vessel.

Assuming that the John K. Shaw was sunk by a collision, the principal question in the case is whether the indentity of these collisions has been satisfactorily established; in other words, whether, during the 24 hours preceding the afternoon of the 24th, when the wreck of the Shaw was first discovered, there were two collisions in that vicinity, or but one.

As there is no direct proof identifying the John K. Shaw as the schooner with which the steamer collided, the evidence on the libelants' part is necessarily circumstantial only. The chief circumstances relied on to show that the schooners were one and the same are the following: (1) Both were three-masted schooners bound up the coast; (2) the John K. Shaw, from the time she left Newport News, might easily have been off Deal beach at the time of the Newport's collision, since only an average speed of four and one-half miles would have been requisite to bring her there at 7 P. M. of the 23d; (3) the site of the wreck when discovered in the afternoon of the 24th, was not far—certainly not over two or three miles—from the admitted place of the Newport's collision, and the latter place is but approximately fixed by estimates only; (4) one witness, the mess-boy of the Newport, testifies that he saw the schooner list and sink a few minutes after the collision, and when from a quarter to a half mile distant; and two others of her seamen, who watched the schooner from the steamer's port side, though they do not swear to seeing the schooner sink or capsize, think she must have sunk, because she vanished or disappeared suddenly when a half mile or thereabouts distant; (5)

there was no other known wreck of a schooner at that time and place; (6) if the two schooners were not the same, then there were two collisions at about the same time and place, and hence two other colliding vessels to be accounted for; but there is no evidence of any other collision,—no other was reported, and no other vessel colliding with the Newport is proved. The Newport has not shown what other vessel it was, if any other, that collided with her or with the John K. Shaw.

These circumstances present a pretty strong *prima facie* presumption and probability that it was the John K. Shaw with which the Newport collided. But the most important circumstance of all, if true, is that the schooner that collided with the Newport sank shortly after. If that could be deemed proved, it would have great weight in discrediting the opposing testimony; for, if another three-masted schooner had been sunk and lost there on the 23d, that fact would in all probability have become known and reported; although this, even, would not be certain, since it might be a schooner returning from a long voyage, and her wreck might have wholly disappeared. But one of the weakest parts of the libelants' testimony is the alleged sinking of the schooner with which the Newport collided. If, on the other hand, that schooner did not sink at the time, or is not known to have sunk; and, still more, if the direction and the kind of the colliding blow were not such as were likely to cause a schooner to sink; and if the schooner, after passing the steamer, showed no signs of sinking, and gave no signal for assistance, though means of doing so were at hand,—then the other circumstances relied on by the libelants are obviously wholly inconclusive.

Careful consideration of the particulars, as regards each of the circumstances relied on by the libelants, has satisfied me not only that they are insufficient to establish their case by a preponderance of proof; but that, notwithstanding my first impressions to the contrary, the probabilities, upon the facts and circumstances proved by the claimants, are that, however the John K. Shaw may have been sunk, it was not through the Newport, but that the schooner colliding with the latter was another vessel. I shall state some of the chief reasons only for this conclusion, without going into all the details of the testimony.

(1) There is no satisfactory proof that the schooner that collided with the Newport was substantially injured. The weight of direct proof, and the probabilities of the case, are to the contrary. The mess-boy is not supported by Murphy, who stood by him watching the schooner. The latter says she sailed away into the darkness, as usual, apparently uninjured. The testimony of the other two seamen for the libelants, that they thought she sank, is based upon her disappearing suddenly some five or ten minutes after the collision, and a half mile or so distant, whereas they thought she should have been seen longer; but their credibility and good judgment are cer-

tainly not sustained by their further testimony that a schooner on that night could be seen, as the one says, seven miles, the other twenty miles, off. Four other witnesses who were watching the schooner from a better post of observation say that she gradually disappeared, sailing away, as usual, into the darkness, without apparent injury. The night was dark, being still clouded and thick to the south and east from the previous snow, but clearing to the westward.

(2) Most of the witnesses say that the schooner, before the collision, was sailing close-hauled, and therefore heading about N. by E.; that her sails at the collision were shaking from an apparent luff to avoid the Newport; and all say that after raking past the steamer she sailed away, or filled away, upon her previous course, until she disappeared from sight. This would not be natural or probable if she had been so seriously injured as to sink within 10 or 15 minutes after the collision.

(3) The schooner gave no call for help, nor signal of any kind indicating disaster or need of assistance. As she passed the steamer, several of the witnesses heard something said from the quarter deck. Two witnesses say it was in substance, "Where in h—l are you going;" an exclamation certainly not indicative of serious injury or impending disaster. After she had passed, a light like that of a lantern was seen on board; but it was not swung, nor was any other signal for help displayed. It is scarcely credible that the vessel should have filled away on her course, and exhibited no signal for help, if so damaged as to sink shortly after.

(4) The libel alleges that the colliding blow was given on the schooner's starboard bow, forward of the foremast,—the lookout of the steamer so testifies; and, if this had been true, doubtless the schooner would have been cut in two or capsized. But all of the other witnesses of the collision disprove the lookout's account in this respect. The blow was clearly a glancing blow upon the schooner's starboard quarter, given when the schooner, having luffed somewhat, was heading either N. or a little W. of N., while the steamer was heading about S. 1-2 W.; and the schooner's quarter raked along the steamer's side, as shown by the mark on the latter, for some 50 or 60 feet, beginning about 25 feet from the steamer's stem. Such a blow was not one that would necessarily do much damage to either vessel. It did none to the steamer, and the subsequent conduct of the schooner would indicate that none was done to her. If so, that furnishes all the explanation called for to account for the absence of proof of the name of the schooner collided with. The collision, in this view, was not one that required reporting, and accordingly was not reported; and hence the schooner was unknown. The steamer, for the same reason, made no official report of her collision, as she would have done had it been accompanied by damage.

(5) There is no certain proof that the Shaw was sunk by collision.

The breaking of the sides of her deck might have occurred in foundering, and from the great weight of iron on deck. So far as the appearances indicate a collision, however, they would indicate a different kind of collision from that with the Newport, viz., a collision on the port side, instead of one on the starboard side; and in the waist, cutting her in two, instead of a glancing blow along the starboard quarter. The wreck of the Shaw showed the taffrail mainly in place, and the rail and stanchions for a considerable distance still standing on the starboard quarter much further than along the port quarter. A sideling blow from the Newport on the schooner's starboard quarter could only have caused her to sink from crushing in that part of her; and it is hardly conceivable that a blow sufficient to crush in her quarter could have left her rail and stanchions standing; and the Shaw's wreck indicated a blow, if any, upon the opposite side.

(6) A moment or two before the collision, the steamer's wheel was hard a-starboard, and her engines were stopped for five minutes. Her previous speed, aided by the wind, was about 15 knots. Under her starboard wheel she swung to port till she headed due north, when she went ahead under one bell at "half speed," being about nine knots. In swinging round to due north she would have gone due east from the meridian of the collision at least a third of a mile. She continued going north about 10 or 15 minutes, without seeing any signs of the schooner, and then swung around again to the southward, and continued on her course. As the schooner was probably going at the rate of six to seven knots, if she continued on her course without injury she would not have been overtaken by the steamer, on this return of about two miles to the northward, after the five-minutes stop of her engines. But, if the schooner had been seriously damaged, she would not have been likely to continue under full sail to the northward; and she would probably have been seen, or at least some boats or signals for help would probably have come into view, since there was clearly ample time, while the schooner was in sight, and before the steamer had got headed to the northward, to have launched her small boats.

(7) The weight of testimony leaves no doubt that on board the Newport there was not, at the time, any belief or thought that the schooner had been sunk or materially injured; and such is the entry in her log. All the circumstances point to this belief on their part; and the testimony of one or two of the discharged seamen to the contrary is not sustained. Every probability is otherwise.

(8) It is not wholly insignificant that out of the seven witnesses that looked down upon the deck of the schooner as she passed the steamer, illuminated to some extent by the steamer's lights, not one noticed any deck cargo; while the Shaw's large deck-load of iron must have been easily distinguishable.

(9) The evidence all tends to show that the place of the Newport's collision was some two or three miles from the place where the wreck

of the Shaw was found the next afternoon. This conclusion depends, to some extent, on estimates; but by no means wholly so. The place of the wreck is fixed, by its bearings from the stations Nos. 5 and 6, as less than five miles off Deal beach. The officer at station No. 5 testified at the trial that it bore from his station S. E. He afterwards made affidavit that he should have said E. S. E.; and as it bore E. by N. from station No. 6, the former would make the wreck less than three miles from shore; the latter, four and a half miles.

All the witnesses from the Newport, however, as well as three for the libelant, estimate the place of the collision as from seven to eight miles off shore. The master went out further than usual to avoid the many coasters that had gathered near shore during the thick and snowy weather previous. It is scarcely probable that all on board should have misjudged the distance from shore in the same way, by making it one-third greater than it was.

The distance and course run by the steamer after passing Sandy Hook and Scotland light-ship, and the bearing of the Highland lights, after the Newport had got headed north, confirm the estimates given by the witnesses of their distance from shore at nearly seven miles. Upon heading north, the Highland lights, as the pilot testifies, bore "about N. N. W.;" the two lights being in range and showing as one. The master says that the Scotland light-ship at the same time bore N. by W. westerly. By passing from half a mile to a mile to the eastward of the latter at 5:50 and running 40 minutes S. by E., and then 10 minutes S. $\frac{1}{2}$ W., as the master testifies she did run, the steamer would have reached, at 6:40 P. M., when the engine was stopped, about 12$\frac{1}{2}$ miles from the Scotland light-ship, and would be bearing, when headed to the northward, within half a point of S. S. E. from the Highland lights, which the pilot says bore "about N. N. W.;" and this would also bring the Scotland light-ship N. by W. westerly, as the master testifies. This would make the steamer about seven miles from shore. The mate's statement that the Highland lights bore N. N. W. from the steamer after she got headed *south* again, I consider a mistake, as it is not reconcilable with anything else in the case, nor with the libelants' theory.

The witnesses upon whom the libelants rely for proof that the schooner struck by the Newport was seen to sink, not only testify under somewhat suspicious influences, but the force of their testimony is greatly weakened by the manifest mistakes and improbabilities that attend it. One of the witnesses, Anderson, who says the schooner disappeared suddenly when about half a mile distant, also says "it was a clear night at the time;" that the steamer was "under full speed;" that it was moonlight; and that without moonlight the schooner could not be seen a half mile off, but thinks it could have been seen a quarter of a mile. Now, the proof is certain that the steamer was not then under full speed, but that her engines were either stopped or going slow; that it was not then a clear night; and,

as the moon fulled on the evening of February 11th, there was no moon above the horizon at 7 P. M. of the 23d. From this it is manifest that not only can no value be attached to the witness' inference that the schooner sank when half a mile off because she suddenly disappeared, but the false circumstances stated discredit him altogether. There are other circumstances that compel me to withhold confidence from the statements of the other witnesses that testify that they saw the schooner sink.

These circumstances altogether are sufficient, as it seems to me, to explain and to outweigh the apparent probabilities against the Newport at first presented. Her narrative is not attended, so far as I can perceive, by any serious inconsistencies, or by any difficulties or improbabilities. I cannot regard the case of the libelants, therefore, as established by any such preponderance of proof as to warrant a decree against the Newport, and the libel must be dismissed. *The Grace Girdler*, 7 Wall. 196; *The Albert Mason*, 2 Fed. Rep. 821; S. C. 8 Fed. Rep. 768; *The City of Chester*, 18 Fed. Rep. 603. But, considering the misfortune of the libelants, and their apparent probable case, the dismissal may be without costs.