UNITED STATES v. The ADRASTUS et al.
OCEAN S. S. CO., Limited, v. UNITED
STATES.

THE GEORGE WESTINGHOUSE.
No. 273, Docket 22010.

United States Court of Appeals
Second Circuit.

Argued June 8, 1951.

Decided Aug. 17, 1951.

Irving H. Saypol, U. S. Atty., New York City, Edward R. Downing, New York City, of counsel, for appellant.

Haight, Deming, Gardner, Poor & Havens, New York City, proctors for Ocean S.S. Co., Ltd., and The Adrastus; David L. Corbin, New York City, advocate.

Before CHASE, CLARK and FRANK, Circuit Judges.

CHASE, Circuit Judge.

This controversy grew out of a wartime collision between the British S.S. Adrastus, owned by The Ocean Steam Ship Co., Ltd., and the George Westinghouse, a Liberty ship owned by the United States. The United States sued the Adrastus and her owner, who filed a cross libel against the United States, each party charging the other to have been solely at fault. The trial court found no actionable fault on the part of either and dismissed the libels. Both parties have appealed.

The collision occurred early in the morning of January 16, 1944, in the ocean off Nova Scotia. A light snow storm punctuated with squalls, in combination with the darkness, made the visibility poor. The Westinghouse was in a convoy of two vessels, the Elk Island Park being the commodore vessel, which was on route from St. John, N. B., to Halifax, N. S., under the escort of the corvette Bayfield of the Canadian Navy. As was customary during the war, this convoy had been ordered by the Canadian authorities to run blacked-out on fixed courses at high speed to designated stations at which specified changes of course were to be made. These initial orders were, however, subject to some modification by the commander of the Bayfield on route in consideration of conditions encountered, and some modification was made. The prescribed course was from St. John through a station called "N" to station "O" at Lat. 43° 01′ N., Long. 66° 35′ W., and thence to station "P" at Lat. 42° 56′ N., Long. 65° 08′ W. but before reaching station "O" the Bayfield ordered a change of course to 90° true at 9:00 P.M. The convoy then followed that course easterly toward Halifax until at 2:00 A.M. the course was altered to 52° true to avoid a westbound convoy. The commodore ship was then about half a mile ahead of the Westinghouse and about two points off to starboard and her running lights were on and remained on until after the collision. Shortly after the change to 52° true the Westinghouse changed to 62° true in an effort to draw nearer the commodore. When the collision occurred the Westinghouse was navigating on this course at her full speed of about ten and one half knots with lookouts stationed as follows: One on the bow, one at the forward gun tub,

one on the flying bridge and on each of the port and starboard quarters with the second mate on the starboard wing of the bridge. The bow lookout, however, was inside a shelter which had been made of rough boards by the ship's crew, a boatswain who was a carpenter giving them some advice. This boatswain, who was the bow lookout for perhaps an hour before, and at the time of, the collision, testified that two portholes which were at the front of this shelter were the size of the ship's portholes, sixteen or eighteen inches in diameter, and that they were fitted with glass; that there were openings both on the port and the starboard side of the shelter about ten inches wide and two feet long, each of which was fitted with a canvas curtain which the witness thought was loose while he was on duty that night though he couldn't remember "whether it hung down when it was loose or whether you had to fix it up." He also testified that from this shelter he could look from dead ahead to "approximately two points abaft the beam" on each side of the ship.

At about 2:20 A.M., while the Westinghouse was thus navigating in the dark with a northeast wind of force 3 in a slight sea with a light, squally snow, the mate on the starboard wing of the bridge observed a shape which he could not identify, but which proved to be the Adrastus, loom up about two points on the starboard bow at a distance he could not determine. About the same time the bow lookout saw the same thing and tried to telephone the bridge but his ring was not answered.

Convinced that the loom was not that of the commodore ship, the mate turned the navigation lights on to full and went back to the bridge to try again to find out what object he had seen. Being unable to do that, he ran back to the wheelhouse, sounded a five-blast signal and had the engines put full speed astern, but the collision was then imminent and occurred before the engines had any appreciable effect. The ships collided at an angle of about 38° within less than a minute after the mate sighted the loom, and, although both were considerably damaged, neither was sunk. At that time the Bayfield was about a mile

and a half away. She had picked up the Adrastus on her radar a few minutes before the collision but had not given that information to the Westinghouse, which had no knowledge of the Adrastus until the collision was inevitable.

The presence of the Adrastus at the point and time of collision was brought about as follows. She had been one of the ships in a large convoy westbound across the Atlantic. About noon on Janaury 15, 1944, she was detached from the convoy and ordered to go to St. John without escort at her full speed of fourteen and one-half knots, on a zigzag course during the day and blacked out at night. She was carrying out these orders at the time of collision on a course 280° true toward a designated station at Lat. 43° 15′ N., Long. 66° 30′ W. She had no information concerning any convoy and knew nothing of the presence on her course of the Westinghouse until immediately before the ships struck. She had no lookout in the bow but had one stationed on the monkey island about one-third of the distance from the stem of the ship to the stern and about one hundred and fifty-six feet from the forecastle head.

The second officer of the Adrastus, who was on watch on the port wing of the bridge, went to the starboard wing just before the collision to speak to the third officer who was stationed there, and while they were talking the stern gunner telephoned. The second officer answered and was informed that a white light had been sighted on the port quarter and a green light on the port bow. During this conversation the third officer looked back to see what had been sighted, saw the lights of the commodore ship and then ran across the wheelhouse to the port side. He then saw the loom of the Westinghouse and saw the lights of the Westinghouse come on. He at once ordered the helm hard astarboard and the engines full speed astern, but the latter order was not executed before the collision.

As both the colliding ships were on courses in accordance with military orders they were bound to obey, we agree with the trial judge that they are not to

be held at fault for what is attributable to such necessary obedience. We also agree that any faults on the part of the Bayfield, as for instance, her failure to give the Westinghouse any warning of an approaching ship when her radar picked up the Adrastus, cannot be charged to the Westinghouse. But, while criticizing both the Westinghouse and the Adrastus for the way they maintained their lookouts, he held neither at fault in this respect and consequently exonerated both vessels. With this, we cannot agree.

■ Although the International Rules [1] do not designate the position of the lookout, they do require the maintenance of whatever is proper in that respect. And while it is true that in wartime the military orders, under which ships in and out of convoys sailed, superseded them, the rules were in full force except as they conflicted with such orders. Consequently, either of these ships could violate the requirement to maintain a proper lookout only at its own risk. Indeed, it would seem that the customary need for properly positioned, vigilant lookouts was enhanced by the circumstances here present. The blackouts and the necessary relinquishment of other ordinarily required navigational safeguards made it all the more important that the safety measures which could be taken should not be slighted.

■ It has long been well established law that when a ship, at the time of collision, is in violation of a statutory rule designed to prevent collisions, it is to be presumed that her fault was at least a contributing cause of it until, and unless, she can show not only that it was not such a cause but that under the circumstances it could not have been. The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148. Although no statutory rule requires the maintenance of a lookout in the bow of a ship, many decisions in our courts have established that as the proper place for one best to observe objects on or at the surface of the water. The Ottawa, 3 Wall. 268, 18 L.Ed. 165; Chamberlain v. Ward, 21 How. 548, 16 L.Ed. 211; The Colorado, 91 U.S. 692,

23 L.Ed. 379; The Sagamore, 1 Cir., 247 F. 743; The Choctaw, 6 Cir., 270 F. 114. The requirement that a lookout shall be kept as far forward as possible, especially if the visibility is poor, is so strict that the presumption of contributory fault arising from its neglect is the same as that created by the violation of a statute and must be overcome, if at all, by the same kind of proof showing that it could not have contributed to the disaster. The Madison, 2 Cir., 250 F. 850. As was said in The Buenos Aires, 2 Cir., 5 F.2d 425, 432, " * * * the courts have held that good navigation makes it necessary that the lookout shall be stationed in the forward part of the vessel and at a point best suited for hearing and observing the approach of vessels and where his vision will be free from all obstructions."

■ The Adrastus did not have a proper lookout forward. He was at least a hundred and fifty feet back from where he might have been and he saw nothing until too late. Certainly this record does not show that he could not have seen the loom of the Westinghouse in time for successful preventive action had he been on the bow, from where the evidence shows the loom of an approaching ship is more easily seen. Even if it be true that a lookout farther back and higher up may the more readily observe submarines lurking under water in war time there is no showing here that in the dark and a snow storm his ability in that regard justified keeping him there instead of in the bow. We think the trial judge's criticism of the Adrastus in respect to her lookout was not only well founded but that her dereliction in that regard was a contributing fault for which she should be held liable.

■ Nor is the Westinghouse in a much, if any, better situation as to the maintenance of a bow lookout. To be sure one was there, but he was enclosed in a most unusual sort of home-made shelter which obviously did obstruct his view to a considerable extent. It is not certain whether the side curtains were in place over the side apertures and hanging "loose" so that

I. Art. 29, 33 U.S.C.A. § 121.

they had to be moved to look through those holes or whether they were hanging "loose" and not covering the holes. But in either event the lookout's view on each side was considerably impaired. Nor is it reasonable to believe that he could see in front as well as he could have seen but for the shelter. If, as the lookout testified, the holes there were covered with glass, the beating of the snow upon it would have somewhat blurred his sight straight ahead, and even if they were open the view was not the unobstructed one which is among the prime considerations behind the strict requirement of the maintenance of a bow lookout which the courts have imposed. A proper lookout must be in a position to see and hear as well as he can. The Buenos Aires, supra, and we are not prepared to believe that one so enclosed as this one was had such indispensable advantages. Nor can it reasonably be said that if his view had not been so obstructed he would not have seen the loom of the Adrastus soon enough to have given the Westinghouse time to avoid hitting her. Consequently we hold both vessels at fault.

Decree modified to hold each vessel for half damages.

E. J. Botts, Honolulu, T. H., Wayne M. Collins, San Francisco, Cal., for appellant.

Howard K. Hoddick, Acting U. S. Atty., Nat Richardson, Jr., Asst. U. S. Atty., Honolulu, T. H., Chauncey Tramutolo, U. S. Atty., San Francisco, Cal., for appellee.

Before MATHEWS, HEALY and ORR, Circuit Judges.

PER CURIAM.