Irene M. WOOD, as Personal Representative and Administratrix of the Estates of William J. Besford, et al., Libellants,

v.

UNITED STATES of America, Respondent, and Consolidated Fisheries, Ltd., Respondent-Impleaded, and Two Other Actions.

United States District Court
S. D. New York.
Oct. 1, 1954.

McNutt & Nash, New York City, proctors for libellants. Edwin Longcope, New York City, of counsel.

J. Edward Lumbard, U. S. Atty., New York City, proctor for respondent. Louis E. Greco, Walter L. Hopkins, Attys., Department of Justice, New York City, of counsel.

WEINFELD, District Judge.

The Wilson Victory, respondent's vessel, is charged with having collided with the fishing trawler, The Bucentaur, causing its loss and that of its entire crew of ten. That The Wilson Victory collided with an object near the Pit Buoy Light in the North Sea in the early hours of the morning of May 21, 1947, is not in dispute; that The Bucentaur was in the vicinity of the area of collision is not seriously challenged. What is challenged is that The Wilson Victory struck The Bucentaur. Thus, the first issue to be

determined is: was it The Bucentaur that was struck by The Wilson Victory at 3:46 A.M. on May 21, 1947, a few miles below the Pit Buoy in the North Sea.

Since all hands on The Bucentaur were never heard from after she sailed from her home port at Lowestoft, England, on May 20, 1947, libellants, of necessity, rely in the main upon circumstantial evidence, some of it physical, and in part upon the testimony of officers of The Wilson Victory.

I have had the benefit of oral testimony given at the trial by the master and the third officer of The Wilson Victory. The balance of the evidence on both sides was submitted through depositions and exhibits. Based upon my observation of those witnesses who appeared before me, an appraisal of their credibility and after a most careful study of the depositions and examination of the physical exhibits, I am persuaded that The Wilson Victory struck The Bucentaur and as a result all hands aboard perished. The factors which have led me to this conclusion require a review of the evidence.

The area about the Pit Buoy Light in the North Sea was a popular fishing ground. It was in the path of the Humber-Elbe Route used by vessels plying between Bremerhaven, Germany and Dover, England. The Bucentaur, a steam fishing trawler, owned by the libellant Consolidated Fisheries, Ltd., was 105 feet in length, 21 feet in beam, and 11 feet in depth. On the morning of May 20, 1947, she left her home port, Lowestoft, England, bound for the Pit Buoy area on a regular fishing trip. Her crew were ten in number. A group of other fishing trawlers left the harbor at the same time, including The Dereske, which likewise was heading for the fishing grounds. The Bucentaur left Lowestoft for the open sea about a half hour before The Dereske, whose master, Captain Challis, knew the characteristics of The Bucentaur of which he once had been skipper. Prior to departure the captains of the two vessels had made arrangements to fish about the Pit Buoy Light,[1] which is approximately 148 miles northeasterly from Lowestoft. The Bucentaur and The Dereske first made for Smiths Knoll 28 miles away, which they reached about 2:00 P.M., and from there they set a northeasterly course for the Pit Buoy. The Bucentaur was three or four points on the port bow of The Dereske. Both trawlers were on the same course and speed—about nine knots. The captain of The Dereske observed her in the same relative position until 10:00 o'clock (British Double Summer Time)[2] when darkness came, at which time he saw her stern light. He then went below, but subsequently and through the night and early morning was on the bridge at various times.

There is some contradiction in the testimony of Captain Challis as to whether or not he continued to see the stern light of The Bucentaur after midnight. However, I am satisfied that from the time of departure of the trawlers from Smiths Knoll he had The Bucentaur in sight while proceeding towards the Pit Buoy fishing grounds. Within three weeks after The Bucentaur was reported lost he filed a report with the Custom House at Lowestoft stating that he had her under continuous observation until midnight. I regard this as more reliable evidence than his recollection given respectively four and six years after the event. Thus, the last time The Bucentaur was seen was midnight on May 20th–21st. Her rate of speed, if maintained, would bring her to the Pit Buoy at approximately 3:00 A.M. or 4:00 A.M., German Double Summer Time.

We now consider the movements of The Wilson Victory. She is a combination cargo and troop ship, 455 feet in length, 62 feet in beam. The Wilson Victory departed from Bremerhaven,

---

1. The fishing ground about the Pit Buoy Light extends over an area of ten or more miles.

2. All references, unless otherwise indicated, set forth the time under which the particular vessel was operating.

Germany, in the late afternoon of May 20, 1947, bound for New York via Dover, England. She proceeded northwesterly along the Humber-Elbe Route, which would take her by the Pit Buoy Light and the adjacent fishing grounds. Captain Chemnitz, the master of The Wilson Victory, was assisted in navigation by S. R. Marchant, a North Sea pilot. The ship's clocks were set to German Double Summer Time, which was one hour in advance of British Double Summer Time.

After leaving Bremerhaven The Wilson Victory proceeded along its charted course without incident up to 2325, May 20, when fog set in. A bow lookout was posted, radar was put into operation, fog whistles were sounded, and all necessary fog precautions taken. At 2328 the captain ordered the engines on stand-by which reduced speed from sixteen and a half to about fifteen knots. When the fog became heavier at 2332 the engines were put on half ahead and within two minutes when a ship's fog signal was heard they were stopped. At 2335 the engines were again put on half ahead and at 2348, when the visibility improved, at full ahead. At midnight (0000 hours) on May 21st, fog again set in, reducing visibility to between two and three miles and the engines were again ordered on stand-by and fog signals resumed. The bow lookout was maintained. Visibility remained at two to three miles until 0300. At 0300 the fog lifted. Visibility, confirmed by radar, was at least eight miles and the engines were again put on full ahead. At 0325 The Wilson Victory, on a westerly course, passed the Pit Buoy Light about a mile off her port beam and altered her course to 209° gyro. In proceeding south southwest she was navigating in a standard shipping lane and one frequented by fishing trawlers. At about 0330 the captain authorized the bow lookout to go below for coffee. At 0335 The Wilson Victory's radar was secured upon order of the master. At about 0340 a low-lying "haze" was seen arising from the surface of the water and at 0342 radar was put back into operation on a four-mile range scale.

Immediately thereafter, visually and by radar check, the master observed a Liberty Ship three miles distant and two points abaft the port beam. Nothing else appeared on the radarscope. The master went to the starboard wing of the bridge to scan the waters ahead. At 0344 the fog set in rapidly and visibility was reduced to about a half mile ahead and the master ordered the engines on stand-by. Fog signals were commenced. At 0345 the master from the starboard wing, the pilot, then in the center of the wheelhouse, and the third mate at the radarscope all saw a white masthead light fine on the port bow. The light appeared to be "about" one-half a mile distant.

A second or two thereafter, the pilot also observed directly beneath the masthead light a small white deck light and made out the loom of a vessel which he believed was 800 or 900 feet away. This second light was not seen by either the master or the watch officer. The master, upon observing the white masthead light, ordered the engines of The Wilson Victory full astern and the wheel hard right. The log and the bridge bell book show that this order was given at 0345. At 0346, according to The Wilson Victory's bridge log, she collided with "an unidentified vessel" on her port side. The loom of the stricken object passed down the port side of The Wilson Victory, into the fog and out of sight.

The first issue to be determined is whether The Wilson Victory struck a vessel. There was some hedging on this issue by referring to an "object" that had been hit. Also, upon the trial the master, the watch officer, and the pilot in his deposition, sought to minimize the force of the impact by referring to it as "slight" and a "light thump." However, the evidence is persuasive that The Wilson Victory was in substantial collision with a vessel and that the struck vessel was a fishing trawler or a small boat. On these issues the ship's logs, reports,

and physical conditions supply the proof. As a result of the collision two stanchions on the port side of the forecastle head were bent, the plates of the forepart of the ship were indented, a piece of the rigging of the struck vessel was caught in the port railing on The Wilson Victory's forecastle head, and its bow was scraped a distance of ten to fifteen feet. This should set at rest any contention that the impact was slight. Its force is further indicated by the fact that soundings of the forward bilges were ordered by the captain immediately after the collision. As to whether a vessel (rather than an "object") was hit, and its type, the short answer is found in the statements and actions of the ship's officers immediately at and after the incident. The captain of The Wilson Victory sent the following wireless approximately a half hour after the collision:

"2 Miles 211 Degrees True From Pit Buoy Collision With Small Craft Vessel Now Stopped In This Position In Dense Fog Ships Passing Keep Sharp Lookout For Any Shipwrecked Persons And Drifting Wreckage Master."

The Wilson Victory's radio log shows that this message was re-broadcast at 0439 and again at 0458 and that a second message was sent about four hours later. In a report to the Army Transportation Corps dated the very day of the collision, the master stated: "We collided with an unknown vessel," and upon interrogation by the United States Coast Guard officials several weeks later likewise confirmed that he was in collision with another vessel.

That this small craft was a fishing trawler of the type and description of The Bucentaur finds support in the testimony of the pilot Marchant who stated that the silhouette which he saw immediately after the collision and called to the captain's attention "struck me as being a small trawler; if not a small trawler a big tug." The inference is fully warranted, and I so find, that the vessel struck by The Wilson Victory was a fishing trawler. The belated attempt, in view of the documentary proof to the contrary, to claim that an "object" was hit and the effort to minimize the force of the collision casts a shadow upon the testimony of those advancing these contentions and their entire testimony must be appraised accordingly.

Having found that a fishing trawler was hit by The Wilson Victory, the further issue remains—was it The Bucentaur?

No signs of life were seen about the struck vessel; no persons were observed aboard it; no bells, whistle signals or outcries of any nature were heard, and the vessel drifted astern and vanished in the fog. The Wilson Victory remained and maneuvered about the immediate vicinity of the collision for about four hours. First she dropped a life ring. General quarters were sounded. About five minutes after the contact floodlights were played in the area, but nothing was seen. Although motor lifeboats were immediately readied, the fog was so thick, according to Marchant, that "to search the water would be useless." It was not until 0409, when it cleared somewhat, that the starboard lifeboat was lowered "to search for survivors." The lifeboat circled in the vicinity, returning to The Wilson Victory from time to time. At 0633 it returned with a capsized lifeboat which was hoisted to the side of the ship and upon inspection was found to bear the insignia "LT 170"—the designation assigned to The Bucentaur by the British Registry Office. In addition to the upturned lifeboat, a point board, used for separating fish, and a dan buoy were also observed, both of which the pilot identified as part of a fishing trawler's equipment. At 0721 a picture of the upturned lifeboat was taken and it was cast adrift. The log of The Wilson Victory records at "0734 no survivors located" and thereupon it proceeded on its way to New York via Dover.

The four-hour search carried on after the collision and the repeated radio messages, "Ships passing keep sharp lookout for any shipwrecked persons and

drifting wreckage" warrant the inference that those on board The Wilson Victory feared a tragedy had occurred. Indeed, her captain acknowledged as much and also that in the twenty-three minute interval between the impact and the lowering of the boat whatever was struck could have gone down, and gone down "in very short order."

The Bucentaur was last observed by the captain of The Dereske at 1:00 A.M. (Wilson Victory time) when she was proceeding, as was The Dereske, in the direction of the Pit Buoy fishing ground. The finding of the upturned lifeboat with the letters "LT 170" at the scene of the collision within 2½ hours thereof strongly suggests that The Bucentaur was the vessel that was struck by The Wilson Victory, particularly since she was due to reach the area at or about the time of the collision. However, libellants' case is not confined solely to the upturned lifeboat "LT 170" and conditions at and subsequent to the collision. In forging their chain of circumstantial evidence they also rely upon a ship's bell, a binnacle top and a bracket which were recovered in the Pit Buoy area after the collision and which it is claimed came from The Bucentaur. It is necessary to retrace the steps which led to their recovery.

Albert Sandford, skipper of the fishing trawler Exyhane, testified that about 6:15 A.M.[2A] May 21, 1947, while about five miles west southwest from the Pit Buoy Light he saw a merchant ship circling a small lifeboat which had the port letters "LT 170" horizontally across the stern; that nearby was a half circular life buoy also with the marking "LT 170" on it, a point board used for separating fish, a bridge housing about ten or twelve feet square and "what appeared to be the part where the bell was on was just out of water." He also observed quite a lot of wreckage floating about. The objects and debris were close together and were in the recognized shipping lane to and from the Pit Buoy. Upon consulting a fisherman's almanac he learned that the letters "LT 170" were The Bucentaur's. As he drew towards the wreckage the merchant vessel sheered to the southward. By the time he reached the wreckage the merchant ship was about one-half to three-quarters of a mile away and he could not see her name. The time and place of his observation warrant the inference that Sandford saw The Wilson Victory after the collision and during the course of its search. Upon his return to port the captain filed a written report of his observation.

Other trawlers observed the bridge housing, as well as the other items of ship's equipment. Sadler, the skipper of the trawler Marlborough, testified: that at or about 7:00 A.M. on May 21st, while fishing around the Pit Buoy area, he received a radio message alerting all ships in the vicinity to look out for survivors and wreckage of a trawler that had been run down. On the day following, May 22nd, or on the 23rd, The Marlborough was approached by The Elbe, a German trawler, and her master inquired of The Marlborough's skipper if he knew a ship had been lost. The latter answered he had heard that "The Bucentaur has gone," to which the master of The Elbe replied, "We've found the bridge top and some other things." The bridge top was on The Elbe's deck and clearly visible to Sadler. The Elbe's master asked Sadler to take the other objects—the bell, the bracket and the compass or binnacle top —ashore, which he did, and upon reaching port on May 30, 1947, turned them over to the Receiver of Wreck at Grimsby, England. The master of The Elbe in delivering them to Sadler stated he had picked them up in the vicinity of the Pit Buoy. The ship's bell, the iron bracket and the binnacle top were identified by The Marlborough skipper as those he had received from the trawler Elbe and, in turn, delivered to the Receiver of Wreck at Grimsby. However, the question still remains as to whether they came from The Bucentaur.

---

**2A.** The Exyhane was on British Double Summer Time.

While no evidence has been presented relating the binnacle top to The Bucentaur, proof was offered with respect to the other two items. Newrick, a blacksmith at Lowestoft, made a positive identification of the bell and bracket. He had received an order in March 1947 for a ship's bell and bracket for The Bucentaur. A special extension lug had to be made for the bell to fit into the socket on the bracket. In all his experience as a blacksmith it was the only time he ever made an extension lug for a bell. The job was so outstanding and unusual that it impressed itself upon him. The circumstances surrounding his work on these objects persuades me that his identification of them was sound and is entitled to credence. The evidence is also persuasive that the bell and bracket were then installed upon, and were part of, The Bucentaur's equipment when she sailed from Lowestoft on May 20, 1947, and were the items picked up by the trawler Elbe.

The defense that the "object" with which The Wilson Victory collided must have been a derelict without life aboard abandoned after a mine explosion or other disaster is pure speculation and without the slightest evidential support. The contention dissolves in the light of the testimony of the master of The Wilson Victory who, when asked to account for the fact that neither he nor the pilot or lookout saw the masthead light of the "object" until within less than a minute of the collision, suggested that the light must have been turned on just at the moment they sighted it. If, in fact, the "object" was a derelict with all life gone, who turned on the light?

 It may not be amiss to note that libellants are not required to establish their case beyond a reasonable doubt[3] but by a fair preponderance of the evidence.[4] Further, that circumstantial evidence is on no different or lower plane than other forms of evidence.[5] Subject to the limitation that the inferences drawn from circumstantial evidence must be reasonable, "there is no requirement that the circumstances, to justify the inferences sought, negative every other positive or possible conclusion."[6] And we are reminded in considering circumstantial evidence " * * * logically the sum is often greater than the aggregate of the parts, and the cumulation of instances * * * may have a probative force immensely greater than any one of them alone."[7]

 The circumstantial and other evidence when pieced together lead to the fair inference that the "unidentified vessel" which The Wilson Victory struck was The Bucentaur and as a result of the collision the vessel and its entire crew were lost. In sum, the evidence establishes that: on May 20, 1947, The Bucentaur, a seaworthy fishing trawler, with a crew of ten, left Lowestoft headed for the Pit Buoy which was the most popular fishing spot in the North Sea in May 1947; when last seen, she was headed for the Pit Buoy; at her course and speed she was due to arrive there at or about the time The Wilson Victory collided with a small vessel a few miles south of the Pit Buoy; after the colli-

3. The Cristobal Colon, D.C., 36 F.2d 825, 826, suggests that where the identity of a vessel is at issue, to sustain recovery the weight of evidence should "amount practically to proof beyond a reasonable doubt." No authority supports any change from the prevailing rule that in civil suits a libellant's burden of proof on issues as to which he has the affirmative is by a fair preponderance of the evidence.

4. The Clara, 102 U.S. 200, 26 L.Ed. 145; The Newport, D.C.S.D.N.Y., 28 F. 658, 660.

5. United States v. Becker, 2 Cir., 62 F.2d 1007, 1010; Lukon v. Pennsylvania R. Co., 3 Cir., 131 F.2d 327, 329.

6. Christie v. Callahan, 75 U.S.App.D.C. 133, 124 F.2d 825, 840. See also Fegles Const. Co. v. McLaughlin Const. Co., 9 Cir., 205 F.2d 637, 639.

7. United States v. White, 2 Cir., 124 F.2d 181, 185; cf. The Slavers, 2 Wall. 383, 69 U.S. 383, 401, 17 L.Ed. 911.

sion The Wilson Victory had part of the rigging of a small vessel caught on her port rail; the impact of the collision was substantial—enough to cause a small vessel to go down in short order; the captain and officers of The Wilson Victory feared a catastrophe had occurred; The Wilson Victory searched at the immediate area of the collision for survivors for almost four hours; they found an upturned lifeboat bearing "LT 170," The Bucentaur's registration insignia, as well as equipment used by fishing trawlers; considerable wreckage and debris were observed in the immediate area, including a life ring with The Bucentaur's insignia "LT 170"; no evidence has been submitted that any disaster or collision to any other vessel was reported as occurring at or about the time and place The Wilson Victory collided with a vessel; neither The Bucentaur nor its crew have ever been heard from since they left Lowestoft on May 20, 1947.[8]

■ We next consider the issues of fault and damages. Each vessel claims the other was solely responsible for the collision. The burden of proof is on each vessel to establish fault on the part of the other.[9]

The respondent resists the claim that it violated Article 16 of the International Rules for Navigation at Sea[10] as then in effect and which in pertinent part provided:

"Every vessel shall, in a fog, mist * * * go at a moderate speed, having careful regard to the existing circumstances and conditions."

As already noted, The Wilson Victory from midnight May 20th–21st to 3:00 A.M. had been approaching the Pit Buoy Light through fog and it was not until 3:00 A.M., when it lifted, that she was put on full steam ahead, sixteen knots. At 0335, within ten minutes after passing the Pit Buoy Light, visibility had so improved that radar, which had been in operation for about four hours, was secured. But the favorable change was short lived. Within five minutes, at 0340, the vessel again ran into fog and visibility was reduced. At 0342 radar was put back into operation. Visibility continued to decrease with the fog heavier towards the bow. At 0344 conditions were sufficiently alarming for the captain to issue the stand-by order alerting the engine room for emergency action. The Wilson Victory, notwithstanding the heavy fog, continued at fifteen knots and it was not until 0345, when the white masthead light was sighted about a mile ahead, fine off the port bow, "just about dead ahead," that the full astern order was given. The collision, according to the log, occurred a minute thereafter.

Respondent, relying upon the principle that "a vessel shall not proceed in a fog at a speed at which she cannot be stopped in the water in one-half the visibility before her,"[11] urges that The Wilson Victory could have been stopped dead from full speed ahead within a distance of 3,070 feet or slightly over half a nautical mile. Accordingly, it presses hard that since visibility was three miles, as verified by radar at 0342,[12] her speed of fifteen knots was moderate since she could have been stopped dead in less than "one-half of the visibility before her."

The difficulty with respondent's position is that while it may be true that at 0342 visibility was three miles off the port quarter, the record is clear that visibility ahead was considerably less at

8. Cf. E. K. Wood Lumber Co. v. Andersen, 9 Cir., 81 F.2d 161, where libellant recovered on circumstantial evidence considerably less persuasive than that presented here. The Newport, D.C.S.D. N.Y., 28 F. 658, is readily distinguishable from this case in several important respects.

9. The Victory (The Plymothian) 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519.

10. 33 U.S.C. § 92 (now 33 U.S.C.A. § 145n).

11. The Silver Palm, 9 Cir., 94 F.2d 754, 757; The Chattahoochee, 173 U.S. 540, 548, 19 S.Ct. 491, 43 L.Ed. 801; The Umbria, 166 U.S. 404, 421, 17 S.Ct. 610, 41 L.Ed. 1053.

12. There was no need for the radar to "warm up" since its previous extended use made it effective at once.

that time and thereafter. There can be no question that from 0340 to 0346, the time of the collision, the fog set in rapidly and became thicker by the minute —so much so that by 0344, when the stand-by order was given, visibility forward was about half a mile and certainly no more at 0345 when the full astern order was issued. All witnesses agree that right after the collision the fog was "as thick as a blanket" and they could not see a thing. As is not unusual, the eyewitnesses disagree as to a number of matters, but they are in accord that at the time the white light was sighted visibility was not more than "about" a half mile; indeed, the pilot put it from a half mile to "not more than one ship's length."[13] The master at one point admitted that the light might have been no more than 1,500 feet away when sighted. Accepting arguendo the respondent's assertion that The Wilson Victory could have been brought to a dead halt in 3,-070 feet at full speed, she could not have been stopped in less than the entire distance of the one-half mile visibility—much less half of that. And even accepting the master's assumption that at fifteen knots she could have been stopped dead in 2,400 feet, she violated the rule of "one-half the visibility."

The respondent's position is further undermined by its assumption that in point of fact the time lag between the sighting of the light and the collision was one minute. The watch officer testified, "it was approximately a matter of seconds after I sighted this white light we * * * struck." The captain testified the hit was made "about a minute" after the sighting, but his Army report states it occurred "a few seconds later." Even allowing for the time he states he rushed from the starboard wing to the wheelhouse after making the observation, it is apparent that the crash occurred within seconds, rather than a minute, after The Bucentaur was sighted.

■ Both the captain and the pilot, engaged specially because of his knowledge of North Sea conditions, knew that their ship was in a standard navigation lane where many travelers were operating; nonetheless, they continued at fifteen knots in heavy fog. What was said in Noble v. Moore-McCormack Lines, D.C., 96 F.Supp. 369 is particularly pertinent:

> "As was stated in Gertrude Parker, Inc., v. Abrams, 1 Cir., 178 F.2d 259, 264, 'The specific rule of moderate speed in a fog, to say nothing of the general rule of prudent navigation, art. 29 of the International Rules, supra, 33 U.S.C.A. § 121, requires moderate speed in conditions of low visibility regardless of whether the "visible distance" test of moderate speed is applicable or not.' This is particularly true when we consider that the Mormacfir knew that she was traveling in an area where fishing vessels were always present." 96 F.Supp. at page 372.

That fifteen knots was not a reasonable speed under the prevailing conditions is perhaps demonstrated by action taken four hours earlier, at 2332, when fog became thick. At that time the captain ordered the engines at half ahead. Thus, the standard of prudent conduct was set by the master himself. Why wasn't the same caution exercised shortly before the collision under similar, if not more difficult, weather conditions?

■ There is upon this record no plausible explanation for failure to exercise the same caution displayed earlier when The Wilson Victory was slowed down in heavy fog unless we accept the pilot's statement that considerable reliance was placed upon radar. Although the captain disavowed such reliance, the pilot admitted that if radar had not been in operation speed would have been reduced. True it is that at 0342 a ship was seen through the radarscope three miles off the port quarter, but the rapidly deteriorating weather and the known presence of low-lying fishing vessels in the area did not warrant maintaining speed at fifteen knots because radar was in operation.

13. Testimony before Ministry of Transport, Exhibit 13.

Radar is an aid, not a substitute, for prudent seamanship.[14] Respondent's expert conceded that the radar model on The Wilson Victory could readily miss low-lying ships or fishing trawlers such as The Bucentaur. The fact is that radar did not pick up The Bucentaur before it was struck.

I find that The Wilson Victory was not proceeding at a moderate speed, having careful regard to the existing circumstances and conditions in violation of Article 16 of the International Rules for Navigation at Sea. The Wilson Victory has failed under The Pennsylvania rule to establish that this fault neither did nor could have contributed to the collision.[15]

The Wilson Victory is also charged with failing to maintain proper lookout in violation of Article 29 of the International Rules for Navigation at Sea [16] as then in effect and which provided:

*"Additional precautions required generally.* Art. 29. Nothing in these rules shall exonerate any vessel * * * from the consequences of any neglect * * * to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

It is undisputed that at the time of collision no lookout was stationed in the bow of The Wilson Victory although one was posted on the flying bridge. The lookout who had been stationed in the bow since midnight went below for coffee at 0330 upon express permission of the master and was not ordered back to his post at 0340 when the fog again developed—or indeed at any time up to the collision.

When proceeding in fog or conditions of reduced visibility, the maintenance of "a proper lookout" as demended by Article 29 requires that a lookout be stationed as far forward as possible unless the weather makes another position more suitable.[17] "Although no statutory rule requires the maintenance of a lookout in the bow of a ship, many decisions in our courts have established that as the proper place for one best to observe objects on or at the surface of the water. The Ottawa, 3 Wall. 268, 18 L.Ed. 165; Chamberlain v. Ward, 21 How. 548, 16 L. Ed. 211; The Colorado, 91 U.S. 692, 23 L. Ed. 379; The Sagamore, 1 Cir., 247 F. 743; The Choctaw, 6 Cir., 270 F. 114. The requirement that a lookout shall be kept as far forward as possible, especially when visibility is poor, is so strict that the presumption of contributory fault arising from its neglect is the same as that created by the violation of a statute and must be overcome, if at all, by the same kind of proof showing that it could not have contributed to the disaster."[18] Thus, The Wilson Victory is liable for her failure to post a bow lookout unless weather conditions forced her hand, or unless she can prove that such failure did not and could not have contributed to the collision.[19]

There is not the slightest evidence to indicate that weather conditions made it unwise to station a lookout in the forecastle. On the contrary, the sea was calm, the wind moderate, and The Wilson Victory was riding easily.

---

14. Pocahontas Steamship Co. v. The Esso Aruba, D.C., 94 F.Supp. 486; Cf. The, Medford, D.C., 65 F.Supp. 622; Triton-Baranof, 1953, A.M.C. 393, 400 (Exchequer Court of Canada).

15. The Pennsylvania, 19 Wall. 125, 86 U. S. 125, 136, 22 L.Ed. 148; Ulster Oil Transport Corp. v. The Matton No. 20, 2 Cir., 210 F.2d 106; National Motorship Corporation v. Pennsylvania R. Co., 2 Cir., 160 F.2d 510; Gulf Oil Corporation v. The Socony #16, 2 Cir., 162 F.2d 869.

16. 33 U.S.C. § 121 (now 33 U.S.C.A. § 147a).

17. St. John v. Paine, 10 How. 557, 51 U.S. 557, 585, 13 L.Ed. 537; Oriental Trading & Transport Co. v. Gulf Oil Corp., 2 Cir., 173 F.2d 108, 111; The Java, Fed.Cas. p. 382, No. 7,233.

18. United States v. The Adrastus, 2 Cir., 190 F.2d 883, 886; Poling Russell, Inc. v. United States, 2 Cir., 196 F.2d 939; The Madison, 2 Cir., 250 F. 850, 852.

19. Footnote 15, supra.

Respondent urges that the absence of a bow lookout could not have contributed to the collision. The master contended that the flying bridge lookout, though 175 feet from the stem, was in a better position to observe than the bow lookout would have been due to the low-lying nature of the fog encountered at 0340. But this explanation is contradicted by the captain's prior actions. At 2332 and again at midnight, a bow lookout was posted when fog appeared. The lookout remained constantly at his post until he was ordered below for coffee at 0330. The captain admitted that the fog on both occasions was of the same general type as that encountered at 0340. Thus, The Wilson Victory again failed to observe the standard of care which her own master had previously set.

But respondent argues, even if a bow lookout could have sighted The Bucentaur earlier than the bridge did, the collision still could not have been averted. He must, so the contention runs, report to the bridge by telephone, and the ensuing delay would nullify the advantage of the earlier sighting. The argument is without merit. A bell was located on the forecastle and could have been used by a lookout stationed there to give instant warning of danger ahead. Moreover, the contention is refuted by the earlier posting of a bow lookout under similar conditions.

■ A bow lookout, stationed 175 feet forward of the bridge, closer to the water, and having an unobstructed view might well have given earlier warning of The Bucentaur's presence and the matter of seconds might well have averted the collision. The respondent has failed to show that the absence of a lookout in the eyes of the ship could not have contributed to the collision [20] and it was, there-fore, a contributing fault for which The Wilson Victory must be held liable.

We next consider fault on the part of The Bucentaur. Respondent charges that The Bucentaur failed to: (1) sound proper fog signals as required by Article 15 of the International Rules for Navigation at Sea; [21] (2) display required lights; [22] and (3) maintain a proper lookout. [23]

Article 15 of the International Rules as then in effect provided:

"In fog, mist, falling snow, or heavy rainstorms, whether by day or night, the signals described in this article shall be used as follows, namely:

"(a) A steam vessel having way upon her shall sound, at intervals of not more than two minutes, a prolonged blast." [24]

■ The evidence is uncontroverted that no fog or other warning signals were heard from The Bucentaur. There is no reason for rejecting the testimony of The Wilson Victory's officers on this issue. With all hands gone, libellants obviously are in no position to controvert this testimony and no evidence has been offered to exonerate The Bucentaur from liability under The Pennsylvania rule.

■ As to the second alleged fault, the evidence is also uncontroverted that only the masthead and deck lights of The Bucentaur were displayed. With their entire attention focused in the area of the white light, it seems unlikely that those on board The Wilson Victory would not have noticed the side lights or either of them had they been visible. But libellants contend the absence of side lights could not have contributed to the collision. It is clear that The Wilson Victory took

20. Cf. United States v. The Adrastus, 2 Cir., 190 F.2d 883 (posting lookout 150 feet abaft the stem held a contributing fault); The Michigan, 4 Cir., 63 F. 280, certiorari denied 159 U.S. 262, 15 S.Ct. 1041, 40 L.Ed. 142 (posting lookout 40 feet abaft the stem held a contributing fault).

21. 33 U.S.C. § 91 (now 33 U.S.C.A. § 145m).

22. Articles 2(a), (b), and (c) of International Rules for Navigation at Sea, 33 U.S.C. § 72 (now 33 U.S.C.A. § 145).

23. Article 29 of International Rules for Navigation at Sea, 33 U.S.C. § 121 (now 33 U.S.C.A. § 147a).

24. 33 U.S.C.A. § 91, now contained in Rule 15(c), 33 U.S.C.A. § 145m(c).

avoiding action upon sighting the white light, but without success. In this circumstance, the presence or absence of side lights could not have altered the situation caused by the other faults of the vessels.

With respect to the third claim of fault, no evidence has been offered and respondent's contention rests upon conjecture.

■■■■■ In sum, both vessels are found at fault in contributing to the collision and are liable for the consequent loss of The Bucentaur and all hands aboard. The damages are to be assessed accordingly subject to the defense of limitation of liability asserted by Consolidated Fisheries, Ltd., owner of The Bucentaur. The plea was in answer to the cross-libel and the impleading petition of the United States, owner of The Wilson Victory, seeking to hold Consolidated Fisheries, Ltd. liable for any damages awarded against it, the United States of America, for loss of life on The Bucentaur. Evidence that The Bucentaur sailed from Lowestoft in a seaworthy condition with its crew of ten men—libellant Wood's decedents— has not been controverted in any respect. There is no basis for finding that the owner had actual knowledge of the wrongful act which contributed to the collision and hence limitation of liability is allowed.[25]

■■■■■ One final question remains. It is clear that whoever was in charge of The Bucentaur at the time of the collision was responsible for its fault and the award in favor of his administratrix must be reduced because of his contributory negligence. Obviously, no proof was submitted as to who was in charge of navigation. In the absence of such proof the master should be held liable for the ship's fault. "[T]he liability of the ship and of the master is identical".[26] While the doctrine of comparative negligence permits damages in personal injury or death claims to be apportioned rather than equally divided, as compelled in the case of injury to a vessel,[27] the facts here presented warrant a 50% reduction of the award in the claim asserted on behalf of the master's estate. The fault of The Bucentaur in failing to give proper fog signals was as much a contributing factor to the collision as The Wilson Victory's immoderate speed.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Should either party desire enumerated or additional findings, these may be proposed upon notice to the other side.

Submit decree in accordance with the foregoing.

---

25. Richardson v. Harmon, 222 U.S. 96, 32 S.Ct. 27, 56 L.Ed. 110; The Atlas, 93 U.S. 302, 23 L.Ed. 863; The Oneida, 2 Cir., 282 F. 238.

26. Bailey v. Sundberg, D.C.S.D.N.Y., 43 F. 81, 83, reversed in part on other grounds, 2 Cir., 49 F. 583, 586.

27. The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586; cf. Comment by Judge Learned Hand in his dissenting opinion in Ulster Oil Transport Corp. v. The Matton No. 20, 2 Cir., 210 F.2d 106 at page 110. See also Ahlgren v. Red Star Towing & Transp. Co., 2 Cir., 214 F.2d 618.